KNOX v. EDEN MUSEE AMERICAIN CO., LIMITED.

(Supreme Court, Special Term, New York County. July, 1893.)

1. CORPORATIONS—CERTIFICATES OF STOCK—VALIDITY.
    Though a by-law prescribes a certain mode of cancellation and disposition of old certificates of stock before the issue of new ones, the corporation may, as regards a purchaser of stock who is under no duty to see the by-law complied with, waive the requirements thereof, and, without canceling the old certificates, issue new ones in their place, which will be valid in the hands of a person taking them in good faith and for value.

2. SAME—INVALID CERTIFICATES—NEGLIGENCE OF CORPORATION.
    A corporation is liable to one who in good faith takes in pledge from an employe of the corporation certificates of its stock which were surrendered for the purpose of transfer, but which, not being canceled, as the by-laws required, before the issue of new certificates, were taken by the employe from the place in which they were kept.

3. SAME—BONA FIDES OF PURCHASER.
    A person taking in pledge from an employe of a corporation, who has no power in regard to the issuance of stock, certificates of stock therein, apparently genuine, issued to persons having no connection with the corporation except as stockholders, and indorsed in blank by such persons, is not affected with notice that other certificates had been issued in their place; nor is he guilty of contributory negligence in not investigating the pledgor's title.

4. SAME.
    The pledgee's failure to observe that one of the four certificates so taken in pledge, though indorsed by the person, to whom it was issued, contained the name of another person as the attorney authorized to make the transfer, was not such negligence as to prevent his recovery as to the other certificates, which were duly indorsed without designating an attorney to make the transfer.

Action by Edward M. Knox against the Eden Musee Americain Company, Limited.  Judgment for plaintiff.

Before Hon. WM. G. CHOATE, Referee.

Henry D. Hotchkiss and William S. Maddox, for plaintiff.
Charles Steele and James W. Monk, for defendant.

CHOATE, R.  This is an action against the defendant corporation to recover damages for the defendant's refusal to transfer to

the plaintiff 15 shares of its capital stock. In May, 1891, one Reynolds, an employe of the defendant, applied to the plaintiff for a loan of $2,500 upon the discount of his note indorsed by one Jurgens. Jurgens was also an employe of the defendant,—the general superintendent of its business. The plaintiff knew that Reynolds and Jurgens were in the employ of the defendant, and supposed that Jurgens was its managing director. He refused to lend the money without security, and Reynolds told him that they (meaning himself and Jurgens) owned 20 shares of the capital stock of the defendant, and he agreed to lend the money on that as collateral. Subsequently, Reynolds brought to the plaintiff four certificates of five shares each,—one issued to Mrs. Eva M. Chase, one to Seligsberg & Co., and two to Mrs. Hattie Z. Blish. They were in all respects regular in form, and genuine certificates. They were all indorsed in blank by the persons in whose favor they were issued, except that in the case of the certificate issued to Mrs. Eva M. Chase the name of Seligsberg & Co. was inserted as the attorney to make transfer on the books. The plaintiff examined the certificates and the indorsements, but did not observe that in the certificate issued to Mrs. Chase the blank was filled as to the attorney to transfer. He made the loan on the note of Reynolds, indorsed by Jurgens, and the four certificates as collateral. Afterwards the loan was paid in part and renewed, and there remains still due to the plaintiff $1,800, with interest from March 2, 1892, on $800, and on $1,000 from January 18, 1892. The renewed notes being dishonored, the plaintiff applied to the defendant for a transfer of the 15 shares represented by the certificates other than that to Mrs. Chase, on which he makes no claim. The defendant refused to make the transfer, and thereupon this action was brought.

The facts relating to the certificates are as follows: The 20 shares had been purchased by the firm of Seligsberg & Co., of which Mr. Hellman, the president of the defendant corporation, was a member. In April, 1891, Jurgens informed Mr. Hellman that one Siebrecht wished to buy 20 shares at $114 per share, and Mr. Hellman agreed to sell him these 20 shares. He took the certificates to the defendant's place of business, which was under the immediate charge of Jurgens, subject to Mr. Hellman's general supervision, and, finding that Siebrecht was not ready to complete the purchase, left the certificates in the company's safe in the office, giving instructions to Jurgens that when Siebrecht paid the money the transfer should be made. About three weeks later, Jurgens sent to Mr. Hellman, at his office in New York city, a new certificate for 20 shares, made out to Siebrecht, complete except as to the signature of Hellman as president. This certificate was signed by Hellman, returned to Jurgens, and delivered to Siebrecht, who paid the price of the shares, which was received by Mr. Hellman. The old certificates were not, in fact, canceled, but in the month of May, 1891, were used by Reynolds and Jurgens as collateral security for the loan made on Reynolds' note by the plaintiff as above related. In December or January following it was discovered that Jurgens

was a defaulter, and soon after he disappeared. It does not appear that Reynolds knew of the fraudulent withdrawal of the certificates, or knowingly participated in the fraud of Jurgens.

The defendant corporation was formed under the business corporation act, (Laws 1875, c. 611.) It had adopted a by-law that "all certificates exchanged or returned to the company shall be canceled by the secretary, and such canceled certificates pasted in their original place in the certificate book, and no new certificate shall be issued until the old certificate has been thus canceled and returned to its original place in said books." By the by-laws the certificates were to be signed by the president or vice president and the treasurer. Mr. Hellman had been president from the formation of the company, and had always signed the certificates, except when he was for a short period out of the country. The certificate and transfer books were kept at the company's office in the safe, of which Jurgens alone had the combination. He had, in effect, had sole charge of these books, receiving old certificates and preparing new ones, obtaining the signature of the treasurer, and presenting them to the president for his signature. In every other instance in which Mr. Hellman, as president, had signed a new certificate, he had had presented to him the old certificate, and saw that it was canceled, in fact, before the new one was issued. In this particular case, Jurgens did not send with the new certificate the old ones canceled, as was usual. The secretary had never attended to the canceling of the old certificates, and neither he nor the president, nor, so far as appears, any officer, had ever been in the habit of examining the stock, transfer, or certificate books, or the returned certificates, at the company's office. Their duties in this respect seem to have been wholly devolved upon Jurgens, the general superintendent and manager of the business. The business was the carrying on of a show in West Twenty-Third street, in a building occupied by the company for that purpose. Its capital stock was $400,000, of which $330,000 was actually issued. The receipts at the door were deposited in bank by Reynolds. Jurgens did not handle the money, but he had been trusted with large amounts of jewelry and other valuables, and nothing had excited the suspicions of the officers of the company as to his honesty. From the time the certificates in question were last seen by Mr. Hellman in the company's safe till Reynolds produced them to the plaintiff as collateral to his and Jurgens' note, there is no evidence as to where they were. This was on the 8th day of May, 1891.

On these facts, which indeed are not disputed, the plaintiff claims—First, that these certificates, never having been surrendered, canceled, and pasted in the certificate book, as required by the by-laws, are still valid certificates, representing actual stock, and that he is a bona fide holder for value; second, that if the certificates are deemed in law surrendered, and new stock issued in place of them is valid, yet that the defendant is estopped to deny that the certificates are valid, and that it is liable to him as a

bona fide holder for value for damages caused by its negligence in permitting them to remain uncanceled, whereby Jurgens was was enabled to make a fraudulent use of them.     The defendant claims—First, that the certificates were mere vouchers, representing no actual stock; second, that the plaintiff is not a bona fide holder; third, that the defendant was not negligent; fourth, that if the defendant was negligent, its negligence was not the proximate cause of plaintiff's loss; fifth, that, as Jurgens was able to accomplish his fraud only by a crime, the defendant is not liable; sixth, that the plaintiff was guilty of contributory negligence.

The first question is whether the three certificates on which this suit is brought represent real stock, or are mere vouchers, as claimed by the defendant.     It is obvious that the same shares cannot be represented by two certificates.     If the old certificates retain their character as representing the actual stock in the corporation, then the new certificate issued to Siebrecht is void as a certificate of stock, and gives the holder who took it in good faith, as appears to be the case, a claim against the company for the false representations contained therein.     It is contended by the plaintiff that the mode of surrendering the old certificates upon the issue of new certificates as prescribed in the by-laws is imperative, and has the force of law, and that no new stock can be created except in the prescribed mode.     It is also suggested on the part of the plaintiff that there is no evidence that at the time the new stock was issued the old certificates were still in possession of the company; that there was, in fact, no surrender of them.     On this latter question, however, I think the proper inference of fact from the testimony is that the certificates which Mr. Hellman left in the safe about three weeks before the issue of the new stock were still held by Jurgens under his instructions up to the time of the issue of the certificate to Siebrecht.     There is no evidence of their removal from the safe before that time. It is in a high degree improbable that, even if Jurgens had before that time conceived the fraudulent purpose which he afterwards carried into effect, he would have disposed of the old certificates, or put them out of his control, before he had secured the signature of Mr. Hellman to complete the new certificate.     His motive in not producing them to Mr. Hellman, if he had such a fraudulent purpose, is obvious. · If he had produced them canceled, as was the usual course of business, it would have entirely defeated his scheme for their subsequent use.     If he had produced them uncanceled, contrary to the usual course of proceeding, it would, in all probability, have attracted the notice of the president, who would not have signed the new certificate until the old ones were actually canceled, and so the fraudulent purpose would equally have been defeated.     His only chance of successfully carrying out his purpose was in the president's signing the new certificate without calling for the production of the old ones.     No doubt he calculated on the chance that Mr. Hellman might not call for

them, for the reason that he had seen them put in the safe, and because he had confidence enough in Jurgens to prevent any suspicions of foul play. It is also highly improbable that he would have disposed of them before the actual receipt of the price from Siebrecht, because the sale was not certain to go through, and, if it failed, the certificates would have been called for, and the fraud would have been exposed at once. In the absence of any proof that the certificates had been removed from the safe before the time when, in May, they were presented to the plaintiff, the presumption of fact is that they remained where they were. Thus, in this case, both upon the presumption arising from the absence of proof and from the probability arising from the circumstances of the transaction, it must be held that the certificates placed in the company's safe for the purpose of transfer by Mr. Hellman were still held by Jurgens, the agent of the company, for that purpose, at the time of the issue of the new certificates.

On the question whether the requirement of the by-law prescribing a certain mode of cancellation and disposition of the old certificates makes it impossible in law for the company to issue a valid new certificate in their place as upon a surrender, I am of opinion that the by-law is not intended to have, and does not have, this effect. Assuming that the by-law is designed both for the protection of the corporation and its stockholders, and also as a safeguard against surrendered certificates becoming again current in the market, which involves a peril not only to the public who may take them in good faith, but to the corporation, who may suffer by reason thereof, I still think that the corporation may, as regards a purchaser of stock who is not responsible to see the by-law carried out, and who may trust entirely to the corporation and its officers to have the proper transfer made, waive the requirements of the by-law, and that stock actually issued for old certificates actually surrendered, though not canceled, will be valid in the hands of the party to whom it is issued, who acts in good faith, and takes it for value. See Allen v. Railroad Co., 150 Mass. 203, 22 N. E. Rep. 917. It is true that such a rule leaves a peril to the public in having the old certificates remain uncanceled in the hands of the officers of the corporation, as illustrated in this case; but the opposite rule would produce even greater hardship, and greater liability to mischief from the use of the new certificate, since the old certificates can only be used fraudulently to produce such injury, whereas the new certificate might be used innocently with the same effect. Moreover, between the vendor of the stock who has given up his certificates to the company and the vendee of the stock who has got the new certificate there never could be any question that the title passed, at least so long as the old certificates remained on the files of the company. The vendor could not dispute the validity of the new certificates, which are issued with his consent; and, the transaction being valid and regular as between them, a third party who suffers damage by the misuse of the old certificates could not, as it seems to me,

claim that the title did not pass.    For these reasons it is to be held that the new certificate was valid, and that the old certificates have become mere vouchers, and have ceased to represent capital stock.    These certificates, however, bear upon their face the declaration of the company in the accustomed form that they do represent actual stock.    If they had been reissued by the authority of the corporation itself, through its officers charged with the duty of issuing its capital stock, and if the whole stock was already issued, they would without any question give a right of action for damages to an innocent purchaser or party in good faith lending upon them as collateral.    If, as in this case, the whole stock had not been issued, they might thereby become valid and genuine stock, but only in case they were issued for full value at par, received by or for the corporation.    The ground of liabil' in the former case would be on the principle of an estoppel in pais, the company not being allowed to deny representations made by it, on the faith of which parties to whom such representations are addressed,—that is, all persons to whom such certificates are offered in the course of business, and who, having given value for them, would be injured by showing the falsity of the representations. Railroad Co. v. Schuyler, 34 N. Y. 30; Holbrook v. Zinc Co., 57 N. Y. 616.    But the corporation did not reissue the certificates, and Jurgens certainly had no authority to do so.

The liability in this case, if any, rests upon the ground of negligence on the part of the corporation, whereby the plaintiff has suffered damage; and in cases of damage by negligence it must generally be shown that the defendant has been guilty of negligence which caused the injury, and that the plaintiff has not been guilty of contributory negligence.    It is argued that the by-law that has been referred to, prescribing a mode of surrender and cancellation, is one for the protection of the corporation.    It may be adopted especially for the benefit of the corporation and its stockholders, but I think there can be no doubt, also, that a corporation which is authorized to issue its stocks, which become, for all practical purposes, negotiable securities, and which it invites the public to treat as such by means of the representations on the face of the certificates, is bound also to adopt reasonable rules to protect the public against the use of surrendered certificates, and to observe a reasonable degree of care and diligence in the enforcement of such rules.    The by-laws adopted by the defendant are similar to those which exist in most well-ordered corporations, and, if observed, are well adapted to secure the public against this danger.    The single precaution ordinarily taken by the president of this company to see for himself the canceled certificates before signing the new certificate would in most cases afford a practical safeguard against this danger.    But, in this case, neither the by-law nor the usual practice of the president in that respect was followed, and I have no doubt that this was such a want of diligence and care as constituted negligence on the part of the corporation.

The next question is whether this negligence was the cause of the plaintiff's loss. The rule is that negligence which is relied on must be the direct, and not the remote, cause; and it is argued that because Jurgens committed the crime of larceny in taking these certificates from the proper custody of the corporation and using them for his own purposes, that crime, and not the negligence of the corporation in making it possible for him to commit that crime, was the cause of the plaintiff's loss. The argument is unsound, because the improper use which was made of the certificates was what might reasonably be expected to result from leaving them uncanceled in the safe of the company, especially under the circumstances of total want of supervision on the part of the officers of the company over the mode in which their manager, Jurgens, transacted the business which he was permitted to do. It is true that ordinarily a party through whose trust and confidence in another that other has been placed in a position in which it was possible for him to defraud a third party will not be held to have been negligent because he did not anticipate the commission of a crime by the person so trusted, which crime was the immediate cause of the loss. Thus a merchant may leave his check book in the keeping of a clerk or employe of whose good character he has a reasonable assurance, and will not be held liable for negligence in so doing if another party suffers loss through the abuse of his confidence in his clerk in case the latter forges his signature to a check, and passes the same off as genuine. But in such a case it is not by reason of the fact that a crime has been committed that the party is absolved from liability, but that the crime committed was not a circumstance which the party had any reason to anticipate from the confidence that he reposed in his employe. If the same person, having in his hands money or negotiable securities belonging to a third party, to whom he owed the duty of safe custody or reasonable care in their safe keeping, should leave the same on his office table, where any employe or any stranger might easily take them without detection, he would not be excused from liability for the negligence because such taking would be larceny. So, if the same person, knowing that his clerk or employe had before committed the like offense, continued to trust him, or if he trusted a stranger of whose character he knew nothing, he might be held for negligence in the continued employment of the clerk or in the employment of the stranger, although the immediate cause of the loss to the other party was the same crime of forgery. The question, then, is whether a corporation owing to the public and to such of them as may deal in its certificates of stock this duty of protection should reasonably be held to anticipate that uncanceled certificates surrendered might through accident or fraud on the part of its employes get into circulation and be the means of causing such injury as that which the plaintiff has suffered. In my opinion, it should be held to anticipate such misuse of uncanceled certificates as possible or probable, and for such negligence would be liable to an innocent purchaser of them. As before

observed in this case, the probability of danger which would always exist was greatly aggravated by the want of supervision over the action of Jurgens, and the failure on the part of the officers of this corporation to perform those duties which they were elected and required by the by-laws and by the nature of their offices to perform, and their negligence was the proximate cause of the injury.

The question still remains whether the plaintiff was a bona fide holder. That he had no actual notice of any want of title in Jurgens or Reynolds is clear; that he was unwilling to loan his money except upon actual security other than their personal undertaking, and that he believed that this security was good, is equally clear. It is claimed, however, that because he was dealing with Jurgens, and knew that Jurgens was in the employ of the company, and believed him to be its managing director, he had such notice that Jurgens might be abusing his trust; that he is not a bona fide holder, or at least should be held guilty of contributory negligence. As between vendor and vendee of stock the certificates for which are indorsed in blank in the usual form, there is no question of negligence on the part of the vendee or pledgee, but only a question of good faith. The doctrine which once obtained, that what would put a vendee or pledgee as a prudent man upon inquiry was enough to deprive him of the position of a bona fide holder, has been entirely exploded, and in recent times abandoned. This has been done in the interest of commerce, to give such instruments their greatest possible value as negotiable or quasi negotiable instruments, and on grounds of public policy, and in accordance with the supposed intent of the commercial community which devised and uses this form of security. 1 Daniell, Neg. Inst. (3d Ed.) §§ 770--776, and cases cited. This, however, is not a question of title as between vendor and vendee, or between the corporation and the plaintiff, since no title did or could pass by the transfer of these certificates. It would seem that the same great commercial policy which protects a vendee or pledgee from the imputation of contributory negligence where the transaction is one in actual stocks requires that the same principle should be applied where a party deals with that which to all appearance is actual stock, as against the corporation, and that contributory negligence, unless it be so gross as in effect to be proof of bad faith, would not impair in such a case the remedy of the injured party against the corporation for damages. So far as the public or any person dealing in such surrendered certificates can know, they are wholly undistinguishable from valid certificates, and the very purpose which has actuated the courts in adopting the rule above referred to would seem to be defeated if exceptions are to be made between the two classes of such instruments by reason of a difference which parties dealing in them can in no possible way, in the ordinary course of business, discover. Such an exception would weaken the security of the public in dealing in valid securities, and would impair their value as quasi negotiable instruments, which it is the policy of the law to observe. In this case, however, even if the principle of con-

tributory negligence as defeating the plaintiff's claim were applied, there is no evidence, as it appears to me, of such negligence which will defeat this claim.

The cases cited and relied upon differ in material particulars from the present case. In Wilson v. Railway Co., 120 N. Y. 145, 24 N. E. Rep. 384, the party who took for his own debt due to him from the president of a corporation notes of the corporation made payable to itself and indorsed by the president as president and also individually, was held chargeable with notice that the president was using the obligations of the company for his own benefit, and on this ground it was held that he could not recover against the corporation. The act of the president in such a case was held by the court to be prima facie unlawful. The party accepting the notes, therefore, was held to take them with actual notice that their use was an abuse of trust, and that there was a defect of title in the person from whom he took them. In the case of Board of Education v. Sinton, 41 Ohio St. 504, the plaintiff, dealing in a personal matter with a member of the board, took bonds which the board had been authorized to issue, but which had in fact been surrendered to the board and redeemed. It was held that the plaintiff was not entitled to the position of an innocent purchaser; that the bonds disclosed on their face that the party from whom he took them was one of the directors, and as such might well have possession of the bonds without the right to dispose of them on his private account. There is no similarity between these cases and the present case. There is no inherent improbability in a manager or employe of a corporation owning a few shares of its capital stock. There was nothing with regard to these certificates which showed to the plaintiff that they had ever belonged to the corporation, or that Jurgens or Reynolds were not the real owners of them, or held them or had held them upon any trust for the corporation. The plaintiff cannot be held to have anticipated so improbable a circumstance as that this corporation, contrary to the practice of all well-regulated corporations, would take no precautions whatever for the cancellation of its surrendered stock.

There is another class of cases cited where a party was held not to occupy the position of an innocent holder where he dealt personally with an officer of a corporation who was charged, to the knowledge of the party so dealing with him, with the duty, either alone or jointly with other officers, of issuing stock, and who sold or pledged for his own debts certificates made out in the name of the vendee or pledgee upon a representation that he, the said officer, owned so much stock. To this class belong Moores v. Bank, 15 Fed. Rep. 141, affirmed 111 U. S. 156, 4 Sup. Ct. Rep. 345; Farrington v. Railroad Co., 150 Mass. 407, 23 N. E. Rep. 109; Hill v. Publishing Co., 154 Mass. 172, 28 N. E. Rep. 142. So in Manhattan Life Ins. Co. v. Forty-Second St. & G. St. Ferry R. Co., (Sup.) 19 N. Y. Supp. 90, where the secretary of a corporation delivered to the plaintiff as security for a loan to himself personally a certificate of stock in the corporation, made out in his own favor, and.

indorsed in blank to the plaintiff, such certificate being fraudulent as against the corporation, and a forgery in respect to other officers' names attached, the corporation was held not bound by the representations contained in the certificate or personally made to the plaintiff by the officer.   These cases all go upon the same principle that a person dealing with an officer of a corporation, who is empowered to act in the issue of stock, cannot trust to the representations either made in the stock certificate or outside of it by such agent or officer when acting in his own business and for his own benefit, because as to the former the party taking the certificate has reasonable notice that the power of the officer may have been abused, and as to the latter representations, though made by an officer of the corporation, they are made not by him officially, but individually.   The rule is well expressed in the case of Farrington v. Railroad Co., 150 Mass. 410, 23 N. E. Rep. 109, which cites and approves the case of Moores v. Bank, above cited, and some other cases.   In that case, Reed, the treasurer of a corporation, as security for his own debt, filled out and signed a certificate of stock in the corporation in the name of the plaintiff.   He used blank certificates that had already been signed by the president. The court, by Field, J., says:

"We have decided in Allen v. Railroad Co., 150 Mass. 200, 22 N. E. Rep. 917, that a purchaser of stock owes no positive duty to the corporation to see to it that the seller surrenders the old certificate and makes an assignment of the stock on the books of the company, but that it is the duty of the corporation which requires these things to be done to see that they are done before a new certificate is issued to the purchaser.   The plaintiff in the case at bar knew that he was dealing with the treasurer of the defendant in his personal capacity as a borrower of money.   If the by-laws of the company had provided that certificates of stock should be signed only by the treasurer, and if he were charged with the duty of attending to the transfer of stock and the issuing of certificates, any person lending money to him for his private use, and taking in his own name a cert'ficate of the company's stock as collateral security, would reasonably be required to investigate the title of the treasurer to the certificate delivered, because, in issuing such a certificate, the treasurer would have a personal interest adverse to that of the corporation.   An agent cannot properly act for his principal and himself when their interests are adverse, and any person dealing with an agent in a matter affecting his principal, and knowing that the interests of the agent are adverse to those of his principal, ought to be held to the duty of ascertaining that the acts of the agent are authorized by his principal.   The difficulty in the present case is that these considerations are only partially applicable to it.   It is on account of the danger that one officer may abuse his power to issue stock certificates that the by-laws of corporations usually require the certificates to be signed by at least two officers of the corporation. 'If one of these neglects his duty, or delegates the performance of it to the other, the safeguard intended by this requirement of the by-laws becomes ineffectual; and if one of these officers, in issuing a stock certificate, has a personal interest adverse to that of the corporation, a person dealing with him, and knowing this, may well be required to take notice that the rights of the corporation are not protected in the transaction to the full extent intended by the by-laws. The decision of this case, we think, must depend upon the question whether it is shown that the plaintiff, in taking this certificate of stock under the circumstances set out in the agreed statement of facts, acted in good faith and with due care.   We are of opinion that the facts were such that the plaintiff

was reasonably put upon inquiry as to the title of Reed to the certificate of stock which he undertook to pledge, and that the plaintiff is to be affected with notice of whatever he might have found out, if he had made proper inquiry. As the plaintiff was not a purchaser of stock in the market, the usages of brokers, in regard to the manner in which stock is transferred, as between the parties to a bargain and sale, made through brokers, have no bearing upon the case. The plaintiff cannot rely upon any representations of Reed, because he knew that Reed was acting for himself in borrowing the money and in pledging the stock. The seal of the corporation might well be presumed to be under the control of Reed for the purpose of affixing an impress of it upon the stock certificates, because he was one of the persons who were required to sign certificates of stock, and was the person who had the custody of the certificates and transfer books. The genuine signature of the president of the corporation upon the certificate was the only fact on which the plaintiff had a right to rely; but, as the president was not attending personally to the issue of this certificate, it was evident to the plaintiff that Reed might possibly be using for one purpose a certificate signed for the president of another. The certificate was filled up in Reed's handwriting, and nothing whatever was exhibited to the plaintiff tending to show that Reed owned any stock, or that any transfer of stock was made to the plaintiff by Reed, except the new certificate which was issued to the plaintiff after the bargain between him and Reed had been made. We think that it is a safer and more reasonable rule to hold that a person taking in pledge a certificate of stock newly issued in his name by an officer of a corporation as security for the private debt of the officer should be required to investigate the title to the stock, if the officer is one who has the power, either alone or with others, to issue stock certificates, than to hold that such a person can rely upon a certificate so issued to him in the absence of actual notice or knowledge that it has been fraudulently issued. In the opinion of the majority of the court, the judgment entered for the plaintiff must be reversed, and there must be judgment for the defendant."

The same principle was applied in the case of Manhattan Life Ins. Co. v. Forty-Second St. & G. St. Ferry R. Co., supra, to a certificate made out in the name of the officer and assigned by him to his creditor. The distinction between this class of cases and the present is also obvious. The certificates which were offered to the plaintiff in this case were not certificates of stock issued to an officer or employe of the company, nor certificates of stock which, so far as the plaintiff knew or had any notice, they had any power to issue, either alone or jointly with others. They were certificates of stock, apparently genuine, issued to various parties having no apparent connection with the corporation except as stockholders, and indorsed in the usual form in blank by the persons to whom they were issued. There was nothing in the transaction to lead the plaintiff to infer that they were held in trust or in any official capacity by the persons by whom they were offered to him. It is unnecessary to consider in this case whether these authorities are consistent with Titus v. Turnpike Road, 61 N. Y. 237, or whether they do not infringe upon the principle which makes good faith, and not the absence of negligence on the part of the holder, the test of his title to negotiable instruments; for, consistently with these authorities, the plaintiff neither had notice of a defect of title, nor was guilty of contributory negligence.

One of the certificates on which the plaintiff made the loan, though indorsed by the person to whom it was issued, contained

the name of Seligsberg & Co. as the persons authorized to make the transfer on the books.   It is claimed that the failure of the plaintiff to notice this fact on the back of the certificate was such negligence on his part as prevents his recovery.   If he had observed this fact, it would naturally have aroused the suspicion of a prudent man that the representation of Jurgens and Reynolds that they owned these certificates was untrue in fact; but it cannot be held that the mere failure to observe this circumstance is such an act of negligence as impairs the plaintiff's rights upon the other three certificates.   If he had not looked upon the backs of the certificates at all, and had trusted the statement of Reynolds that they were duly indorsed, while he would have taken the risk of that fact, I do not see that his right would be impaired in respect to such as were so duly indorsed.   The fact that his examination of the indorsements was not as careful as it might have been does not impair his position as an innocent holder of those that were duly indorsed.   He makes no claim, and could make none, under the certificate made transferable by Seligsberg & Co.   The plaintiff is entitled to judgment for the amount of his loss, not exceeding, however, the value of the 15 shares, with interest from the date of his demand for their transfer.   Findings may be submitted within 10 days.