WILLIAM H. HILL *vs.* C. F. JEWETT PUBLISHING COMPANY.
LLEWELLYN POWERS *vs.* SAME.

Suffolk.   March 26, 1891. — June 26, 1891.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & MORTON, JJ.

*Corporation — Shares of Stock — Fraudulent Issue by President —
Previous Misconduct.*

The president of a corporation, who was not the proper officer to issue certificates of stock, his duty with regard thereto being merely to affix his signature, was allowed access to its blank certificate-book and to the corporate seal, and availed himself thereof to issue forged certificates away from its office. He had, with the knowledge of the corporation, been guilty of previous misconduct in transferring shares of stock standing in his name to a third person, instead of to associate stockholders, as he had agreed to do. *Held,* that the corporation was not liable for the president's act in issuing such forged certificates.

TWO ACTIONS, described in the writ as in contract or tort, to recover damages occasioned by the refusal of the defendant corporation to recognize as valid certain shares of stock held by the plaintiffs, and to issue new certificates therefor. The cases were tried together in this court, before *Morton,* J., who reported them for the consideration of the full court, in substance as follows.

The defendant corporation was organized on August 24, 1886, and its entire capital stock, $75,000, which was divided into 750 shares, was on September 25, 1886, issued to Estes and Lauriat, book publishers, in consideration of merchandise turned over by that firm to the corporation. Clarence F. Jewett, after whom the corporation was named, was made its president, and Walter M. Jackson, a junior partner in that firm, was the treasurer. When the corporation was organized, Estes and Lauriat agreed with Jewett that the latter should have the privilege at any time within a year of having one half the stock issued to him at

a price which was placed at two thirds of its par value, and on or about August 1, 1887, when both Estes and Lauriat were abroad, Jewett elected to take shares, and at that time stated to Jackson that he could not then pay therefor, but would do so as soon as he could. The certificate of Estes and Lauriat covering the whole issue was thereupon cancelled, and Jackson caused certificates covering half of the stock to be made out to Jewett, with the understanding that he was to give his notes for the price agreed, and Estes and Lauriat were to hold the stock as collateral. Jewett gave his notes to that firm, but Jackson, instead of holding the shares as collateral security therefor, delivered the certificates to Jewett, who took the same and thereupon transferred the shares represented thereby to Evans and Company, who had advanced him money with which to carry on stock speculations. Subsequently Estes and Lauriat ascertained that Jewett had thus transferred the certificates, and, having confidence in Jewett's business ability, redeemed his pledge of the shares to Evans and Company, and took Jewett's notes therefor in addition to the other notes given by him in payment for the stock.

In January, 1888, Jewett was indebted to Estes and Lauriat upon all his notes, and that firm found him to be financially irresponsible, but continued to elect him president of the corporation, and to allow one half of the capital stock to stand in his name. The corporate seal was kept in the office of the corporation, and the book of blank stock certificates was kept in the safe therein, and Jewett had access to both of them. Each plaintiff had lent money to Jewett, and he transferred to the plaintiff in the first case in October, 1888, and to the plaintiff in the second case in October, 1889, as collateral security therefor, a certificate of shares in the defendant corporation, properly indorsed by him, that given the former being for 376 shares, and that to the latter for 375 shares. Both certificates purported to be issued to Jewett on September 25, 1886, and were written upon blanks taken from the back part of the book of blank certificates belonging to the corporation, and bore the corporate seal. Each certificate was signed by Jewett as president, and purported to be signed by Jackson as treasurer, but the latter's signatures thereon were forged by Jewett.

These certificates were delivered to the plaintiffs by Jewett in their respective offices. Jewett resigned as president of the corporation in April, 1890, and his frauds were subsequently discovered. The returns made by the corporation to the tax commissioner in June, 1887, showed that the whole number of shares stood in the name of Estes and Lauriat, and a like return made in May, 1889, showed that 375 shares stood in their name and 375 in that of Jewett; and a return to the commissioner of corporations made in October, 1889, showed that the same number stood in the name of each. After Jewett's frauds were discovered, the certificates issued to him, dated September, 1886, were cancelled, and a certificate for the same number of shares was regularly issued to Estes and Lauriat. The by-laws of the corporation provided, in article 3, that the president should "sign all certificates of stock," and by article 9, "Each stockholder shall be entitled to a certificate of his stock under the seal of the corporation, and signed by its president and treasurer. Shares may be transferred by an instrument in writing signed by the owner thereof, or by his attorney duly authorized in writing to sell, assign, and transfer the same; such written transfer shall be recorded by the clerk in a book to be kept for that purpose; such records shall be made and kept within the Commonwealth of Massachusetts. The purchaser named in such instrument so recorded shall, on producing the same to the treasurer and delivering to him the former certificate, be entitled to a new certificate."

The plaintiffs did not contend that the signatures upon the certificates purporting to be those of Jackson were genuine, or that any of the money borrowed of the plaintiffs went in any way to the defendant, or to its benefit.

The judge ruled that neither action could be maintained, and ordered a verdict in each case for the defendant. If the ruling was correct, judgment was to be entered on the verdicts; otherwise, the verdicts were to be set aside, and the cases to stand for trial.

*R. M. Morse, Jr. & C. E. Hellier,* for the plaintiffs.

*S. J. Elder,* (*W. C. Wait* with him,) for the defendant.

ALLEN, J. The by-laws of the defendant corporation provide that "each stockholder shall be entitled to a certificate of his

stock under the seal of the corporation, and signed by its president and treasurer." The certificates taken by the respective plaintiffs each called for these two signatures, and purported to bear them. The plaintiffs were therefore apprised of the necessity for two signatures. In point of fact, however, the certificates did not bear the signature of the treasurer, his name having been forged by the president. There was no special provision in the by-laws giving the president anything to do in respect to the issuing of certificates of shares, except a requirement that he should sign all such certificates. Transfers were to be recorded by the clerk. The purchaser named in a transfer so recorded was entitled to a new certificate upon producing the transfer to the treasurer, and delivering to him the former certificate. There was no actual or ostensible authority in the president to issue certificates. He was only to sign them. The certificates taken by the plaintiffs were invalid for want of the two signatures required by the by-laws.

But the plaintiffs contend that the defendant is nevertheless bound to make the certificates good, or is responsible for their being bad, on the ground that, in view of his previous known misconduct, it was negligent in permitting Jewett to remain president of the corporation, and to have control of its certificate-book and seal, and that the cases fall within the principle that, where one of two innocent persons must suffer a loss from the fraud of a third, the loss must be borne by the one whose negligence enabled the third person to commit the fraud.

In order to reach this conclusion, it must be made to appear that the frauds and forgeries of Jewett were such natural and probable results of his continuance in the office of president of the corporation that the defendant ought to have anticipated and guarded against them, and also that the plaintiffs on their part exercised due diligence and precaution in accepting the certificates from him.

In the absence of any previous misconduct on Jewett's part, it could hardly be maintained that there was any negligence on the part of the corporation in keeping its seal and book of certificates of shares where the president could have access to them, so as to be able to remove blank certificates from the end of the book, and impress the corporate seal upon them. We are not

aware that it is customary for corporations in this country to keep their seals or books of certificates in such a way that access to them can only be had when two or more officers are present. The chief safeguard in respect to the certificates is the necessity of two signatures. And, accordingly, when one who has had confidence reposed in him has availed himself of his opportunity to commit a fraud upon others by means of forgery, it has usually been held in England that the loss was not a natural or probable result of the confidence thus reposed, even though it showed carelessness, and that it was too remote to be properly chargeable upon those who were thus careless in reposing the confidence. *Bank of Ireland* v. *Evans' Charities*, 5 H. L. Cas. 389. *Staple of England* v. *Bank of England*, 21 Q. B. D. 160, 176. *Swan* v. *North British Australasian Co.* 2 H. & C. 175, 189. See also *Vagliano* v. *Bank of England*, 22 Q. B. D. 103, 117; *S. C.* on appeal, 23 Q. B. D. 243, 255, 263.

The plaintiffs rely much on *Shaw* v. *Port Philip Gold Mining Co.* 13 Q. B. D. 103, which in many of its general features much resembles the present case, but with certain differences. In that case the secretary of the defendant company issued a certificate of shares, with the name of a director forged by himself. The person to whom it was issued bought shares on the market, through a broker, who received a transfer signed by the secretary, accompanied by what purported and in all respects appeared to be a regularly issued certificate of those shares. These were deposited at the company's office, with the request for the issue of a new certificate, in the usual way. The new certificate was issued in the usual form by the secretary, but the signature of a director, which was required, was forged. It was a part of the regular and authorized duty of the secretary to receive and examine transfers and certificates of shares, to have transfers registered, to procure the preparation, execution, and signature of certificates with all requisite and prescribed formalities, and thereupon to issue them to the persons entitled to receive them. Moreover, the company after the issue of the certificate paid a dividend thereon, by check signed by the secretary and two directors. The decision of the case, which was not heard before the court of appeal, was placed on the ground that the company had made it the duty of the secretary

to procure the preparation, execution, and signature of certificates with the prescribed formalities, and thereupon to issue them to the person entitled to receive them. The principal facts upon which the decision turned are wanting in the case before us. The president of the defendant corporation was not the proper officer to issue certificates, and the certificates which the plaintiffs received did not come from the office of the defendant in regular course of business, but they were received by the plaintiffs under private and personal transactions between themselves and Jewett, the president.

The plaintiffs, however, contend that the previous and known misconduct of Jewett had been such that it distinguishes the present case from others, and that by reason thereof the defendant should be held responsible for his acts. This misconduct consisted in pledging his shares to Evans and Company, when he had agreed to pledge them to his associates in the corporation. According to the original understanding, when the corporation was formed, Estes and Lauriat subscribed and paid for the whole of the stock, but there was an agreement under which Jewett was to have the option of buying one half of the stock at a certain price, at any time within one year. Jewett was president of the company, and Jackson, one of the firm of Estes and Lauriat, was treasurer. In the absence of the two senior members of the firm, Jewett elected to take his half of the stock, but stated that he could not very easily pay for it then, and Jackson consented to issue the certificates to him, with the understanding that he was to give his notes for them, and that the firm would hold the stock as collateral. The stock was accordingly issued to Jewett, who took the certificates and did not pledge them to the firm, but afterwards pledged them to Evans and Company. There is no distinct statement how it happened that Jewett was allowed to take away the certificates, instead of pledging them on the spot to the firm, nor how soon afterwards he pledged them to Evans. Apparently, confidence was reposed in him, and at any rate there is nothing to show that any steps were taken to compel him to pledge the shares to the firm according to his promise. What Jackson did in consenting to the issue of the stock to Jewett without retaining them in pledge was within his power as a member of the firm.

On the whole, we find nothing to show that the corporation or its other members had reason to suppose from what Jewett had done that he would be likely to issue forged certificates of shares, if allowed access to the certificate-book and seal of the corporation ; and, accordingly, it is not to be held responsible for his criminal fraud, as for an act made possible by its negligence.

In the cases heretofore determined by this court, where a corporation was held responsible for the fraudulent issue of shares, the certificates were in fact signed by the proper officers whose signatures were required, and there was carelessness on the part of the president in leaving with the treasurer certificates signed in blank by himself, and also carelessness on the part of other officers of the company. *Allen* v. *South Boston Railroad,* 150 Mass. 200.

In each case the entry must be,     *Judgment on the verdict.*