# CABBAGE v. CITIZENS BANK & TRUST CO. et al.— 214 S. W. (2d) 572.

Eastern Section.    March 9, 1948.

Petition for Certiorari denied by Supreme Court, October 16, 1948.

Susong, Parvin & Fraker, of Greeneville, and H. C. Smith, of Morristown, for Gladys B. Cabbage.

C. K. Ellis, of Rutledge, and J. H. Hodges, of Knoxville, for Citizens Bank & Trust Co. and C. K. Ellis.

W. O. Lowe, of Knoxville, for Linda and R. D. Wolfenbarger.

Donaldson, Montgomery & Kennerly, of Knoxville, for Pearl Hickle and Mrs. O. O. (Irene) Dyer.

D. S. Beeler, of Rutledge, for Eugene Condry, et al.

GOODMAN, J. The original bill in this cause was filed by Gladys B. Cabbage, individually and as Administratrix of the estate of C. B. Cabbage, Deceased, against

the Citizens Bank & Trust Company, of Rutledge, Tennessee, and certain other named creditors of said estate, and against the minor children and heirs at law of said decedent, setting forth the insolvency of said estate and seeking the transfer of its administration to the Chancery Court of Grainger County. The bill was sustained for the purposes indicated and the transfer ordered. Claims against the estate and claims and counter claims between parties to the cause, have been asserted and issues joined by answer, cross bill and petition; some of which issues have been resolved and concluded without appeal.

It is deemed unnecessary to recount the various pleadings in detail, but only to consider them as they become material to a determination of the particular matters which are now in controversy before this Court. The respective parties will be referred to by their designation in the Court below.

C. B. Cabbage was for many years Cashier of the Citizens Bank & Trust Company, and the officer actively in charge of the operation of this institution. He was a highly respected, popular and trusted citizen of his community and, in addition to his banking position, numbered among his avocations those of real estate and insurance agent, feed dealer, and Minister of the Gospel. He apparently maintained an unquestioned reputation until May 1942, when his activities in the bank were brought under scrutiny through the discovery of an irregularity in connection with a personal obligation. As a result thereof, he was required to furnish security to the bank for this and other obligations, which security has become of paramount importance to the issues here presented. Following Cabbage's death in October 1943, it developed that he had engaged in peculations of varied

sorts during his tenure as Cashier of the bank, some of which have been adjudged and are admitted to be valid claims against his estate and the bank. Others, are the subject of dispute, upon appeal to this Court. All propositions presented for review here have been ably and exhaustively briefed by counsel.

Exceptions reserved to the decree of the Chancellor and errors assigned thereon will be treated under descriptive headings.

I. THE SCOPE OF THE COLLATERAL AGREEMENT HELD BY THE CITIZENS BANK & TRUST COMPANY.

In May 1942, an examination of the bank disclosed that notes of the Rutledge Feed Company, held by the bank, amounting to over $2000.00, had been charged off. It was learned that C. B. Cabbage, the bank's Cashier, owned the business individually and operated it under this trade name. The bank required him to execute a personal note for this indebtedness and to secure the bank through the execution of a deed of trust on a house and lot in Rutledge, the procurement and assignment of four policies of life insurance in the amount of $2500.00 each, and the assignment of ten shares of Citizens Bank & Trust Company stock held by him. It has been stipulated that this security was evidenced by a collateral agreement as follows: ''That the said assignment of the proceeds of the life insurance policies aforesaid, and the proceeds of the capital stock of Citizens Bank & Trust Company aforedescribed, and the deed of trust on the house and lot aforedescribed, was made to secure certain notes due the said Citizens Bank & Trust Company by Lewis Phelps Laura Phelps and Carson Phelps, and J. P. Bullis, on which notes he was endorser, and to

secure any and all other obligations, he might then owe or thereafter owe the said bank, directly or indirectly.''

The Chancellor held that the security afforded by this agreement should be applied toward the satisfaction of liabilities adjudged against the bank as a result of the peculations of the Cashier, as well as the latter's contractual obligations to the bank, direct and indirect. The complainant and cross defendant, Gladys B. Cabbage, individually and as Administratrix of the Estate of C. B. Cabbage, Deceased, excepted thereto and assigns the same as error upon appeal.

We are of the opinion that the record amply supports the decree of the Chancellor in this regard. A determination of this issue resolves itself to a construction of the agreement in the light of the circumstances surrounding its execution. Although the rule of ejusdem generis is persuasive, it is not conclusive. The intention of the parties may determine its applicability. The case of Fourth National Bank v. Stahlman, 132 Tenn. 367, 178 S. W. 942, L. R. A. 1916A, 568, is considered related only in connection with the principle that the meaning and intent of the language employed in a pledge agreement should be determined with due regard to the surrounding circumstances. ''Obligation'' is the particular word used in the subject assignment. It is a term susceptible of considerable scope, depending of course upon such words of limitation as may accompany it and the purpose of its usage as made manifest by the situation under which it is applied. ''The term 'liability' has been defined as meaning 'obligation' and 'obligation' has been said to be equivalent to, and practically synonymous with 'liability'. 'Obligation' has been defined as a legal liability, liability generally, whether such liability be founded in contract or tort.'' 46 C. J. 849. It is said

to have two well defined legal meanings, "(1) Where it is the name given to the contract itself; (2) the other includes those cases where it refers to the duty imposed on a person in connection with a contract to perform it, or to a liability arising from his contract, or from his actionable, tortious conduct." Vol. 29, Words and Phrases, Perm. Ed., page 40.

"The terms of the agreement under which the collateral is taken may authorize it to be held for the satisfaction of all debts which may accrue against the pledgor; and, in this situation, the property may be applied to the satisfaction of any debt upon which he at any time becomes liable to the pledgee, whether as an individual or as a member of a partnership." 41 Am. Jur. 613.

The instant agreement extends rather than restricts the term "Obligation". It provides that the same shall secure "any and all other obligations he might then owe or thereafter owe the said bank, directly or indirectly." This alone would not suffice to make the agreement effective as to obligations other than those of the nature specified. But at the time this security was pledged, it had been discovered that the Cashier, Cabbage, had charged off notes held by the bank, which though being ostensibly the obligation of the Rutledge Feed Company, were in fact his own. Under the circumstances, this was more than a mere contractual liability. It amounted to fraud, a deceit practiced upon the bank which should and, we think, did serve as a warning to the other officers and directors of this institution. Despite the fact that the evidence in connection with this discovery tends somewhat to discount any apprehension of dishonest motives on the part of the Cashier and to minimize concern on behalf of the officials, it appears manifest that the security was demanded as a precautionary measure ex-

tending in its intent beyond the scope of mere contractual liability. Any reticence on the part of the bank officials, demonstrated in the manner his act was characterized and in their failure to then remove him from a position of responsibility, may be attributed to his value and importance to the bank.

II. THE CERTIFICATE OF STOCK HELD BY MISS PEARL HICKLE AS COLLATERAL TO HER LOAN TO C. B. CABBAGE.

It appears that on January 14, 1942, the cross-complainant, Miss Pearl Hickle, loaned C. B. Cabbage the sum of $2500.00, taking his personal note therefor. No security was afforded for this loan at the time. However, subsequent thereto and following the discovery of the irregularity in connection with the Rutledge Feed Company notes and the consequent execution of the instruments securing the bank, the bank's president advised Miss Hickle of Cabbage's financial condition, but suggested that he might have some unpledged bank stock which would possibly be available as security for her loan. Whereupon, she made demand upon Cabbage for either payment of the loan or security therefor. Shortly thereafter, the latter presented her with a certificate for twenty-five (25) shares of stock in the Citizens Bank & Trust Company. The certificate was issued to C. B. Cabbage and was endorsed by him. It was dated September 21, 1929 and bore the purported signature of N. J. Johnson, a former president of the bank and of C. B. Cabbage, Cashier, as well as the corporate seal. Miss Hickle accepted the stock without questioning its validity or making inquiry concerning same and deposited it for safe keeping in her lock box at the bank. Following the death of C. B. Cabbage, it was discovered

that the stock was spurious; that it represented an excess to the authorized capital stock of the bank, and that the signature of N. J. Johnson, President, to the certificate, was a forgery. The certificate, No. 200, had been torn from the stock book, stub and all; as had certificate No. 199, the disposition of which has been yet undetermined.

By her cross-bill, Miss Hickle insists that if the certificate is invalid, the bank should be held liable for any loss sustained on Cabbage's note. The Chancellor adjudged the estate of C. B. Cabbage indebted to the cross-complainant for the principal amount of the note, interest and attorney's fees, but dismissed the cross-bill as against the Citizens Bank & Trust Company. From this, Miss Hickle has appealed and assigned error.

The principal contention of the bank is that this cross-complainant is not a purchaser or holder for value of the stock, that no consideration was paid therefor at the time it was delivered to her. Further defense is predicated upon the inauthenticity of the certificate and the fact that its issuance exceeded the bank's authorized capital stock.

In Heymann v. Hamilton National Bank, 151 Tenn. 21, 266 S. W. 1043, it was held that the bank, as holder of stock as collateral, was not a purchaser for value to the extent of that portion sought to be applied to an antecedent debt. The Uniform Stock Transfer Act, Chapter 113, Acts of 1917, relied upon as a definitive of "value" in the more comprehensive sense as now established, was held to be unconstitutional by reason of the fact that the Act was broader than its caption. However, this defect was remedied by a later Act of the same designation, Chapter 91, Acts of 1925, which has become embodied in the code, Secs. 4094-4117, of Tennessee. In this Act, Sec. 4117(1), it is provided:

" 'Value' is any consideration sufficient to support a simple contract. An antecedent or preexisting obligation, whether for money or not, constitutes value where a certificate is taken either in satisfaction thereof or as security therefor." In Figures v. Sherrill, 181 Tenn. 87, 178 S. W. (2d) 629, 634, 152 A. L. R. 420, our Supreme Court said, "Indeed, by the Uniform Stock Transfer Act, Code, Sec. 4094 et seq., enacted in 1925, certificates of stock are made practically negotiable in this jurisdiction." It has been generally established that even where the certificate is spurious, the corporation of issuance may, under certain circumstances, be estopped to deny its validity; or, if beyond the corporate authorization, held for the loss occasioned the holder. The general rule has been stated thus, "Fraudulent stock certificates are not, however, certificates in legal contemplation and give no rights of their own force. The act of the corporation in issuing them, where they have been accepted and acted upon in good faith by another, is deemed merely to estop the corporation from denying their validity." 13 Am. Jur. 420.

There are two distinct lines of authority pertaining to the subject controversy, relied upon by the respective parties, but we do not find them to be in conflict. In the case of Moores v. Citizens' National Bank, 111 U. S. 156, 4 S. Ct. 345, 349, 28 L. Ed. 385, the Court held that the plaintiff therein who had loaned money on an illegally issued certificate of stock was not an innocent holder. But that case is clearly distinguishable from this and others differing in point of fact, for the certificate therein involved had been procured and fraudulently issued by the bank cashier directly in the name of the plaintiff and showed upon its face that "No certificate could be lawfully issued without the surrender of a former cer-

tificate, and a transfer thereof upon the books of the bank.'' The Court held that the plaintiff was put on notice as to this and relied upon the cashier as her agent to see that proper transfer thereof was made. In Cincinnati, N. O. & T. P. Ry. Co. v. Citizens' National Bank et al., 56 Ohio St. 351, 47 N. E. 249, 43 L. R. A. 777, and other cases of similar import, the courts have, in substance, held to the proposition that a corporation which, through negligence, permits its agent, held out to the public as one having authority to act, to perpetrate a fraud through the pledge of spurious stock in such company, regular upon its face, was accountable therefor to the injured party. In Green v. Caribou Oil Mining Co., 179 Cal. 787, 178 P. 950, the Court upon rehearing, adopted the opinion of the District Court of Appeal, wherein the Court, after citing with approval, Cincinnati, N. O. & T. P. R. Co. v. Citizens' National Bank, supra; National Bank of Webb City v. Newell-Morse Royalty Co., 259 Mo. 637, 168 S. W. 699, and Havens v. Bank of Tarboro, 132 N. C. 214, 43 S. E. 639, 95 Am. St. Rep. 627, said [179 Cal. 787, 178 P. 951], ''In each of them the court placed its decision upon the application of the simple and just principle of the law that whenever one of two innocent parties must suffer by the action of a third, he who by his negligence has enabled such third person to occasion the loss must bear it; and in Havens v. Bank of Tarboro, supra, it was added that where the secretary issued the certificate and delivered it to a third party who acted without knowledge and in good faith, paying value for it, such party had the right to act upon the presumption that the representations of such certificate were truthful, and not false and fraudulent, and, the company having confided to him the trust of executing the business the agent was held out to the public as com-

petent, faithful, and worthy of confidence; and that
though he deceived both his principal and the public by
forging and issuing false certificates, it is but reasonable
that the principal, who placed him in the position to
perpetrate the wrong, should suffer the loss." In most
instances wherein this question has been presented, the
fraudulently issued stock exceeded the authorized capital.
Allen v. South Boston R. Co., 150 Mass. 200, 22 N. E. 917,
5 L. R. A. 716, 15 Am. St. Rep. 185. But there are two
features generally common to the decisions referred to
not present in the case under consideration. The cer-
tificates bore genuine signatures, and were pledged con-
temporaneous with the making of the loan, not given to
secure an antecedent debt. We think that the latter
circumstance is unimportant in view of the provisions of
the Uniform Stock Transfer Act, supra. The former
was an essential element in the basis on which negligence
was attributed to the corporation; the practice of the
president or other principal officer signing stock cer-
tificates in advance and leaving them where they were
available for issuance without further supervision, ex-
amination or approval. However, negligence may other-
wise be exhibited with equally imputative consequences.
In the instant case, the Cashier was Secretary of the
Board of Directors and custodian of the stockbook;
and although the officers and Directors of the bank had
knowledge of at least one irregular act on his part, they
chose to provide security against loss to the bank and to
allow him to continue in his same capacity with all of the
authority and means at his disposal which he had for-
merly possessed. An examination of the stock book
subsequent to the issuance of the spurious certificate
would have revealed the nefarious act and possibly af-
forded some remedy prior to Cabbage's death. In our

opinion, the officers of the bank, having discovered Cabbage's tendencies, should have exercised closer supervision over his activities, if in fact his retention under the circumstances, can be justified at all. On the other hand, there appear to be no reasonable grounds upon which the cross-complaint should be repelled for neglect. The circumstances under which she demanded and received the stock in pledge were such, we think, as would convince the ordinarily prudent person of its authenticity and serve to lull them into inaction. The matter of holding a corporation for loss incurred through the issuance of forged stock is not without precedent. In 18 C. J. S., Corporations, Sec. 254, the tenor of the rulings on this subject is stated thus, ''The act of an officer, agent, or employee of a corporation in forging the necessary signature of another officer or agent to a certificate of stock and fraudulently issuing the same is a criminal act for which the corporation is ordinarily not liable in absence of negligence on its part rendering the perpetration of the forgery and fraud possible; but, although it has been said that the question of whether a corporation is liable because of negligence arises only when the genuine signatures of the proper officers are attached, there is authority holding the corporation liable to a defrauded party who has himself exercised due care in taking the certificate, where the forgery and fraud were rendered possible by its negligence in failing to observe due care to guard against such frauds or in supervising its officers and employees charged with the performance of duties in connection with the custody and issuance of certificates.'' In Hill v. C. F. Jewett Pub. Co., 154 Mass. 172, 28 N. E. 142, 143, 13 L. R. A. 193, 26 Am. St. Rep. 230, the Court held that the corporation was not liable on forged certificates of stock, but in relation to previous alleged mis-

conduct of the officer charged with the forgery said, "On the whole, we find nothing to show that the corporation or its other members had reason to suppose from what Jewett had done that he would be likely to issue forged certificates of shares, if allowed access to the certificate book and seal of the corporation; and accordingly it is not to be held responsible for his criminal fraud, as for an act made possible by its negligence." In Fifth Ave. Bank v. Forty-Second St. & G. St. Ferry R. Co., 137 N. Y. 231, 33 N. E. 378, 380, 9 L. R. A. 331, 33 Am. St. Rep. 712, the corporation's secretary forged the signature of the president to a stock certificate, countersigned the same, and delivered it to a partner for use in raising money. The court in holding the corporation liable said, "It was a certificate apparently made in the course of his employment, as the agent of the company, and within the scope of the general authority conferred upon him; and the defendant is under an implied obligation to make indemnity to the plaintiff for the loss sustained by the negligent or wrongful exercise by its officers of the general powers conferred upon them." And further approved the rule stated in Beach on Private Corporations, (Volume 2, Sec. 488, P. 791) as follows: "When certificates of stock contain all the essentials of genuineness, a bona fide holder thereof has a claim to recognition as a stock holder, if such stock can legally be issued, or to indemnity, if this cannot be done." As aforestated, we are of the opinion that, under the evidence in this case, the officers of the bank were negligent. The situation and relationship of the parties and all circumstances are material to this conclusion. In our smaller communities, particularly, we have come to repose implicit confidence in the officers of our institutions, and, rightfully or not, due care has not required the dealing at arm's length

with one's neighbor. Whether or not justified in the strict sense of the law, the custom is preferable to the rigid measures sometimes made essential elsewhere. To contend otherwise would be to retrogress in that which holds the greatest hope in the development of human relations.

■■ The contention is made that the cross-complainant parted with nothing when she obtained the certificate and would therefore be entitled to nothing. The matter of consideration has been previously discussed in connection with the existing law pertaining to stock transfers; however, having determined that she was a holder for value, the Court can go no further than surmise the results which might have obtained had no such certificate been issued. The bank would certainly have suffered no loss through direct liability to Miss Hickle and her potential toward a partial if not full, recovery against Cabbage would have probably been more promising than that which she may now anticipate from his estate. The further question was raised in the Court below as to the right of the cross-complainant to proceed in equity on the cause of action as stated. That her claim was properly filed against the estate of C. B. Cabbage in this cause cannot be questioned. Moreover, we view it as appropriate to the inherent jurisdiction of our Chancery Courts, if not as surely by statutory authority, that such a related action be sustained coincidently to the end that full and complete justice be done. Gibson's Suits in Chancery, 4th Ed., Secs. 36, 38; this rule being limited to the assumption of jurisdiction for all purposes incidental to its jurisdiction of the main subject. Gregory v. Merchants State Bank, 23 Tenn. App. 567, 135 S. W. (2d) 465. We are of the opinion that the Chancellor was in error in dismissing the cross-bill, and hold the

cross-defendant, Citizens Bank & Trust Company, secondarily liable for the judgment herein entered in favor of the cross-complainant and against the estate of C. B. Cabbage.

III. THE ERRORS ASSIGNED BY LINDA AND R. D. WOLFENBARGER.

The Chancellor found in favor of the Citizens Bank & Trust Company and the Estate of C. B. Cabbage, and against the defendants and cross-complainants, Linda Wolfenbarger and R. D. Wolfenbarger, with respect to certain alleged indebtedness evidenced by the latters' note secured by a deed of trust on property located in Grainger County and referred to in the record as the "Bullis Farm". Judgment was rendered thereon, including principal, interest and attorney's fees, in the sum of $8,563.78; with the provision that in event a sale of the property under foreclosure failed to satisfy the judgment and the costs incident to the sale, the bank might proceed against the additional security afforded by a trust deed on property of the defendants situated in Blount County, Tennessee. Upon appeal, these defendants and cross-complainants, contend by their assignments of error, (1) that the deed of trust on the Blount County property is void because it fails to describe the indebtedness secured; (2) that they are entitled to a credit on the indebtedness to the Citizens Bank & Trust Company by reason of a failure in title as to 13¾ acres of the "Bullis Farm"; (3) that the bank failed to comply with its contract to pay off a lien on said farm in favor of the Federal Land Bank of Louisville in the approximate sum of $2200.00; that the bank failed to disburse the proceeds of its loan to them as directed; and that if the bank is not liable for the Federal Land Bank

loan and the value of the 13¾ acres, the Court should have held the estate of C. B. Cabbage for the same.

Consideration of these matters resolves itself to two main propositions; first, the validity of the trust deed on the Blount County property and, second, the responsibility of the bank and of the Estate of C. B. Cabbage for the payment of the loan to the Federal Land Bank and the failure in title as to 13¾ acres of the ''Bullis Farm''.

The Trust Deed executed on the Blount County property provides that the same is given to secure ''payment of $1.00 and any and all other amounts the said first parties herein owe at this time or shall hereafter during the tenure of this trust deed owe to the Citizens Bank & Trust Company, Rutledge, Tennessee, or any renewals or extensions of time that may be granted thereon.'' We are of the opinion that this is sufficient to give a binding effect to the Trust Deed. Coupled with the circumstances of its execution and relationship of the parties, as disclosed by the evidence, it meets the test as laid down by the Court in Owen v. George Cole Motor Co., 155 Tenn. 250, 292 S. W. 1, 2, wherein it is said, ''It appears, therefore, from our decisions that, in a case free from fraud, where the language used does not tend to deceive or mislead as to the nature or amount of the debt, and where the description is enough to direct attention to sources of accurate and complete information as to the debt, a misdescription of the debt may be corrected and an imperfect description completed by parol evidence, and the mortgage held a good security for the real debt intended to be protected.'' This appears to be the generally accepted rule. 36 Am. Jur. 727; Annotation 145 A. L. R. 370. We find no error in Chancellor's decree in so far as the validity of the subject deed of trust is concerned.

▮ It is next insisted that C. B. Cabbage who, it appears, negotiated the sale of the farm to these defendants was acting as agent for the bank and that the failure of title as to the 13¾ acres and the indebtedness to the Federal Land Bank is the obligation of the latter and of the estate. In our opinion, the evidence supports the decree of the Chancellor in connection with his findings on these issues. Without elaborating further than a reference to his opinion as to these matters, we hold from the proof that the transaction, the conveyance of the Bullis Farm, out of which the various contentions herein arise, was a matter of privity between Mrs. Bullis, the vendor on the one hand, and Mr. and Mrs. Wolfenbarger, the vendees, on the other. The evidence adduced in connection therewith is considered insufficient to support the relief sought by the cross-bill. Although it was well established that Cabbage engaged in various stratagems by which persons were defrauded, we are unable to find wherein the proof provides a cause of action growing out of the subject transaction, attributable to this course of conduct. It results that each of the foregoing assignments must be overruled and the Chancellor affirmed.

IV. THE ASSIGNMENTS OF ERROR ON BEHALF OF EUGENE CONDRY AND OTHER COMMON CREDITORS.

Assignment of Error No. III, filed by the defendants and cross-complainants, Eugene Condry, J. P. Cope and Pearl Cope, is in substance the same as assignment No. II filed by the defendant and cross-complainant, Pearl Hickle. Hence, they will be treated together. The latter appealed on all of the grounds contained in the assignments filed on behalf of the common creditors but apparently abandoned the same, with the exception noted.

(1) With respect to the allowance of interest and attorney's fees on notes of C. B. Cabbage, deceased, held by the Citizens Bank & Trust Company.

■ Counsel for Appellants refer to the unpublished opinion of this Court in the case of Enos Myers, et al. v. V. H. Clay Ammons, an equity cause from Grainger County, decided at the September, 1943, Session of this Court, held at Knoxville. However, the circumstances of the two cases differ in this; in Myers v. Ammons, a portion of the note indebtedness was admitted and payment deposited in the registry of the Court prior to its due date. The Court in its opinion, said, "On July 28, 1941, a sum of money was paid into the registry of the Court which stood in the place and stead of the land. Why should the defendant be allowed interest or attorney's fees on the One Thousand, Two Hundred and Fifty ($1250.00) Dollar Note? This note was admittedly owed. The money was deposited in the registry of the Court prior to its due date." This was in effect a tender; but the instant case involves no parallel. The fund was held in trust by the bank pending an adjudication as to its application, the rights of all parties being reserved. The distinction, we think, is clear. On the one hand, there was an established right to the fund, and on the other, though the indebtedness was admitted, the matter of application of the proceeds of the security had to await the determination of the Court in the ensuing litigation. Similarly, the case of Fourth National Bank v. Stahlman, supra, heretofore discussed in connection with the subject of collateral agreements, is not considered applicable. The Court therein simply applied the principle heretofore recited, that a tender in full payment of a note was sufficient to exonerate a debtor from payment of attorney's fees. We find no error nor abuse

of discretion on the part of the Chancellor in allowing interest and attorney's fees on the notes in question.

(2) The allowance of interest and attorney's fees on the Lewis and Laura Phelps notes.

■ Exception is taken on behalf of the common creditors of the estate of C. B. Cabbage to the allowance of interest and attorney's fees on the note of Lewis and Laura Phelps held by the bank, by reason of the fact that the liability of the makers had been settled through the conveyance of certain property to the bank and the surrender of the notes. By stipulation entered into between Gladys B. Cabbage, individually and as administratrix of said estate, it was agreed that the liability of the estate, by virtue of the guaranty and endorsement of C. B. Cabbage, would continue. There appears to be no valid reason why such settlement should not have been consummated by and with the consent of the guarantor or his representative. Hence, his obligation for any deficiency would continue irrespective of the release of the principal obligor and the cancellation of the original instrument. The obligation became evidenced by the new engagement. But the Chancellor held that interest would be allowed up to the date of the sale of said land by C. K. Ellis. Interest had been theretofore paid on the note up to October 1, 1943. There appears to have been a miscalculation of interest as reflected in the decree of the Chancellor. Judgment will accordingly be entered herein only for the balance, if any, remaining after the application of the net proceeds of the sale, on the principal, interest computed from the above date to the date of the sale by C. K. Ellis, Trustee, and attorney's fees.

(3) The right to a Marshalling of Assets.

The Chanellor held that the equities of the widow and children were superior to the rights of unsecured credi-

tors and required the bank to proceed first, against the decedent's real estate, second, against other collateral and last, if necessary, to satisfy its indebtedness from insurance funds on hand.

As heretofore mentioned, C. B. Cabbage, for the purpose of securing the bank, executed a deed of trust on a house and lot in Rutledge, and assigned to the bank ten (10) shares of stock as well as insurance policies aggregating $10,000.00 The insurance policies were made payable to his estate and the proceeds thereof, subject to the assignment in favor of the bank, are, by statute, exempt from the claims of creditors. Code Sec. 8456, Acts 1845—46, Ch. 216, Sec. 3. The bank, therefore, had two distinguishable types of security, (a) the mortgage and bank stock, and (b) the insurance policies. The former, subject to the bank's lien, would constitute assests available for distribution to unsecured creditors. The latter would not. It is insisted on behalf of the widow and children of the deceased that the bank should seek satisfaction of the deceased's indebtedness first out of the real estate and bank stock. The common creditors have challenged the right to a marshalling of assests, and assign error to the action of the Court in directing same. It may be said that appellants, indirectly at least, are seeking a marshalling also, though conversely. The accepted view, applicable under these circumstances, appear to be; "A beneficiary of an insurance policy pledged by the insured to secure a debt has, it seems, a right to require the creditor to resort first to one collateral, although this result will not follow where the creditor is named by the insured beneficiary with a provisio that. the proceeds of the policy over and above the amount required to satisfy the debt, shall be paid to others." 35 Am. Jur. 396. The exception indicated is in direct conformity with the decision of our Supreme Court

in Gwynne, Adm'r v. Estes et al., 82 Tenn. 622. However, the instant case is clearly distinguishable from Gwynne v. Estes, in that Cabbage's insurance policies were made payable to his estate and assigned to the bank. The fact that the widow or children are not specifically named as beneficiaries is, we believe, immaterial to the present issues. Judge Lurton, Gilliam et al. v. McCormack et al., 85 Tenn. 597, 4 S. W. 521, 523, quotted the principle of the equitable doctrine of marshalling securities, as stated by Professor (Promeroy, Eq. Jurisprudence, Sec. 1414) as follows: "That a person having two funds to satisfy his demands shall not, by his election, disappoint a party having but one fund. The general rule is that if one creditor, by virtue of a lien or interest, can resort to two funds, and another to one of them only, —as, for example, where a mortgagee holds a prior mortgage on two parcels of land, and a subsequent mortage on but one of the parcels is given to another,—the former must seek satisfaction out of that fund which the latter cannot touch." White et al. v. Fulghum et al., 87 Tenn. 281, 10 S. W. 501. But, whereas, we have seen that the heirs at law of the deceased have a right to have the security applied so as to preserve the proceeds of the insurance policies, no such right exists in so far as unsecured creditors are concerned. However, their rights will be protected to the extent consistent with the preservation of prior equities. King v. Patterson, 129 Tenn. 1, 164 S. W. 1191. Although we recognize the unfortunate position of the common creditors herein, and are constrained to grant relief to the full extent of legal and equitable permit, the exemption provided the widow and children by statute takes precedence and is entitled to be preserved as against all but those holding superior liens, and even they must minimize the croachment.

For the reasons herein recited, the decree of the lower Court is affirmed, except in the particulars indicated. The respective appellants, with the exception of Miss Pearl Hickle, will pay the costs incident to their appeals. Costs incident to the appeal of Miss Pearl Hickle are adjudged against the Citizens Bank & Trust Company, Rutledge, Tennessee.

McAmis and Howard, JJ., concur.