The plaintiff, Mays E. Montgomery, appeals from the judgment of the trial court finding that Montgomery could not recover from the defendant corporation, Hughes Developers, Inc. ("Hughes"), for its issuance of a spurious stock certificate, which Montgomery took as collateral to secure a personal loan he made to the president of Hughes Developers. We affirm in part, reverse in part, and remand.
 I. Facts
On May 20, 1991, Mays E. Montgomery lent Morris W. Frank $100,000; to secure that loan Frank executed a promissory note, which contained a notation stating that "(5%) 50 shares of Hughes Developers, Inc. to be assigned as additional collateral." In accordance with this notation, Montgomery received as collateral from Frank "Stock Certificate No. 8" of Hughes representing 50 shares of stock ("the certificate"), together with an "Irrevocable Stock or Bond Power" signed by Frank. The certificate had been issued to Morris Frank on May 1, 1991. The certificate bore the corporate seal and was signed twice by Morris Frank in his corporate capacities as president and secretary of Hughes. In 1994, Montgomery lent Frank an additional $50,000, which was secured by the same 50 shares of stock. Frank paid interest on the note and executed a renewal note each year until 1997.[2]
Hughes was incorporated in Madison County, Alabama, in 1989. The articles of incorporation list Frank as one of two original incorporators and as one of the initial directors of the corporation. The articles limited the number of authorized shares to 1,000.
It is undisputed that, at the time of the original loan, Frank served as president, secretary, and operating officer of Hughes. All stock certificates issued by Hughes that could be located had been signed by Frank, as issuing agent, on behalf of the corporation, including stock Hughes had issued to him. No other authorized issuing agent was identified by Hughes at trial; indeed, no other signature, besides Frank's, appears on any of the admittedly valid stock certificates issued by Hughes. While there were at least three other shareholders in Hughes, the operation of Hughes, with few exceptions, appears to have been controlled solely by Frank.
In 1997, Frank ceased making any payments on the note. After Frank's death in 1998, Montgomery requested that Hughes transfer into his name the certificate Montgomery had received as collateral for his loan to Frank. Gregory D. Gray, a *Page 1111 
shareholder of Hughes, who became president and a director of the corporation following Frank's death, denied Montgomery's request to transfer the certificate representing 50 shares of stock to Montgomery because the 50 shares of stock represented by the certificate were in excess of the total number of shares authorized by the articles of incorporation and the certificate representing the 50 shares was therefore void.
Montgomery sued Hughes and Gray, seeking the following relief:
"COUNT I
". . . .
 "9. That [Montgomery] be granted a Judgment against Hughes for the sum of $150,000.00, interest and attorney fees, which will extinguish the debt owed Montgomery, and upon payment of the same that Montgomery be ordered to deliver unto Hughes the stock assigned by Frank to Montgomery.
"COUNT II
". . . .
 "10. [Montgomery] moves that the Court order and direct the stock certificate of Hughes which is in the possession of Montgomery, being 50 shares of Hughes, be transferred and reissued by Hughes to Montgomery, and the stock of Hughes be structured to allow Montgomery to own 5% of the total number of shares of common stock of Hughes Developers, Inc. which will have the effect of having Montgomery being the owner of 5% of Hughes Developers, Inc.
"COUNT III
". . . .
 "11. That in the event [Montgomery] is mistaken for the relief moved for, [Montgomery] moves for such further and different relief as may be meet and proper."
Before trial, Gray was dismissed from the action. Montgomery has not appealed that dismissal.
At trial, Hughes alleged that the 50 shares of stock held by Montgomery were spurious; that those shares exceeded the authorized capital stock of the corporation; that the excess stock was unauthorized by the corporation; and that the corporation had received no consideration for the pledge of stock to Frank.
Also at trial, Montgomery's counsel attempted to clarify his claim for relief against Hughes as stated in count I of his complaint, stating that the claim was based on the certificate, and not on the personal note signed by Frank:
 "THE COURT: You have got another action in which you're essentially attempting to have the corporation made responsible for the loan and I noted that the notes — none of the notes were signed in the capacity as president of the corporation and, I guess, I am sitting here while you go through all wondering if you are trying to perform the note or establish some kind of apparent authority to execute a note on behalf of the corporation, to make the corporation —
 "[Montgomery's counsel]: No, sir, not in any way whatsoever. What I am trying to show is that — is that there has been a defense asserted that this stock is not valid, that it is not proper stock, that, number one, that it is fraudulent — his answer says it is a fraud, his answer states all of these things. We contend that we will show by the evidence and by the actions of Morris Frank that he had total, complete, unqualified control of this corporation and could do anything he wanted to and I contend that *Page 1112 
that is the evidence and that is what the totality of all of this is.
 "THE COURT: So you are not maintaining your claim then that the corporation is responsible for the 100 —
 "[Montgomery's counsel]: No, sir, there are some cases, though, that seem to indicate that if a person who has been given apparent authority goes out and he does issue some type of fraudulent stock, let us say that, but yet the corporation clothed him with the authority to do things of that nature, then the corporation might be liable for a judgment, but as far as executing a note and saying the corporation is responsible, no, I am not doing that.
 "THE COURT: So then if I understand you then, you are not still maintaining a claim against the corporation for $150,000 plus interest judgment on the grounds that when Mr. Frank signed, he signed on behalf of the corporation?
 "[Montgomery's counsel]: I am not saying he signed on behalf of the corporation, but if the corporation gave him the authority to go out and issue stock and sell land and do anything he wanted to as a — just a personal corporation, and he goes out and he issues stock, then, in my opinion, they would be barred from that and even though they might not honor the stock, there are some cases which hold they are required to pay off."
Following the hearing, Montgomery also presented written arguments to the trial court in which he argued that even if the trial court found that the 50 shares represented an overissue of Hughes's stock, the overissue provision of Article 8 of Alabama's Uniform Commercial Code justified the recovery requested in count I of his complaint.
After an ore tenus hearing the trial court found as follows: "The stock Certificate Number 8 purportedly issued by the defendant corporation to Morris W. Frank, in which the plaintiff claims a security interest, was an overissue of stock unauthorized by the corporation." The trial court concluded:
 "Therefore, the Certificate Number 8, and the shares it purports to represent, are void. As the plaintiff cannot hold a valid security interest in a void instrument, plaintiff's claim for relief in Count II for an order directing the defendant corporation to issue him a stock certificate declaring his ownership of 50 shares of stock in, or 5% ownership of, the defendant corporation is denied."
The trial court also found:
 "The debt owed the plaintiff was incurred by Morris W. Frank personally. It was not the debt of, and was not guaranteed by, the defendant corporation. Therefore, plaintiff's claim for relief in Count I is denied."
The trial court further summarily denied "all other claims." Montgomery appealed.
 II. Analysis
Accepting the trial court's findings of fact as true, as we must, we agree that because the stock was an overissue, the 50 shares of stock represented by the certificate are void.[3] "It is a well-established principle that any issue of stock by a corporation in excess of the amount prescribed or limited by its charter is ultra *Page 1113 
vires, and the stock so issued is void, even in the hands of a bona fide purchaser for value."Crawford v. Twin City Oil Co., 216 Ala. 216, 218, 113 So. 61, 63 (1927). The adoption of Article 8 of Alabama's Uniform Commercial Code codified this established principle of corporation law that an overissue of stock is illegal, and the provisions in Article 8 for validating a security or requiring its issue or reissue are drafted so as to avoid an overissue. Consequently, the person who claims to be the holder of a security that is defective because it is an overissue, is left without a valid security. Therefore, the trial court, in the present action, correctly determined that Montgomery was not entitled to an order compelling Hughes to transfer the stock to Montgomery, and that portion of the judgment is due to be affirmed.
However, despite the well-established rule that stock that represents an overissue is void, even in the hands of a bona fide purchaser for value, it is equally well established that the bona fide purchaser has a right to recover damages from an issuer who has permitted an overissue to occur. This right of recovery was traced by the Court of Appeals of New York, writing in 1865, to an eighteenth century decision of the Court of Chancery in England:
 "[The liability of a corporation for injury arising from an act of the directors in excess of the corporation's powers] was established by the Court of Chancery in England a century ago, in Ashby v. Blackwell (2 Eden, 299). In that case, one question was, whether a party to whom the secretary of a bank company had permitted a transfer of shares on a forged power of attorney, was entitled to recover of the company the sum he paid on such transfer. The secretary in that case, in violation of the rules of the company, had permitted the transfer under a letter of attorney which did not comply with the rules. It was contended that the purchaser ought to have inquired into the reality of the authority. Lord Ch. Northington declared the conduct of the secretary to have been gross negligence, chargeable upon the company, and he held that the company `must and ought to answer for their and their servants' negligence.' . . . He accordingly adjudged the company to pay the vendee the amount he had paid for the stock . . . ."
New York New Haven R.R. v. Schuyler, 34 N.Y. 30 (1865) (quotingAshby v. Blackwell, 28 Eng. Rep. 913, 914-15 (1765)). In New York New Haven Railroad, an officer of a corporation issued stock certificates to his personal trading firm, which then resold the stock to unsuspecting purchasers; the stock was void by reason of overissue. Although the corporation claimed that the officer's actions were unauthorized, the Court, following the rule first established in Ashby, held that a group of lenders who had lent money upon stock certificates that were void by reason of overissue were entitled to a recovery from the corporation.34 N.Y. at 75-78. The Court stated:
 "The [parties] who have been led into loaning their money upon certificates and transfers, held and made by parties who had like credits on the books, and who apparently complied with every condition, stand on the same footing with those [who directly purchased the stocks from the officer in good faith and for value]. Public policy and the true interests of all parties concerned, as well as plain principles of equity and justice, require that the corporation make good the losses they have sustained."
34 N.Y. at 78.
In Cabbage v. Citizens Bank Trust Co., 31 Tenn. App. 283,214 S.W.2d 572 *Page 1114 
(1948), the secretary of the board of directors, who was also custodian of the stock book, issued himself stock, without corporate authorization; the stock certificates bore the corporate seal, his signature as secretary, and a forged signature of the corporation's president. The secretary then gave this stock, which also represented an excess of the authorized capital stock, as collateral to secure a personal loan. The Tennessee Court of Appeals held that the holder of this spurious stock was a bona fide purchaser for value, entitled to indemnity from the corporation. Cabbage, 31 Tenn. App. at 294-95,214 S.W.2d at 577. See also Havens v. Bank of Tarboro, 132 N.C. 214, 43 S.E. 639 (1903) (holding that a bona fide purchaser for value was entitled to recover from a corporation, where the corporate secretary issued the false stock certificates — though he deceived both his principal and the public by forging and issuing false certificates — because it was the corporation that had placed the secretary in the position to perpetrate the wrong); Cincinnati, N.O. T. Ry. v. Citizens' Nat'l Bank,56 Ohio St. 351, 47 N.E. 249 (1897) (holding that a corporation that, through negligence, permits its agent, held out to the public as one having authority to act, to perpetrate fraud through the pledge of spurious stock, regular upon it face, was accountable to the injured party).
The rule, based upon the principles of agency, allowing a bona fide purchaser of spurious stock to recover against a corporation has been recognized by Alabama courts. In Randle v. Walker, 17 Ala. App. 211,84 So. 551 (1919), the Court of Appeals stated:
 "'On the clearest principles a corporation owes the duty to all persons dealing in its stock to observe care in the issuance of such stock, and particularly in the matter of the supervision of its issuing officers. A purchaser of stock has a right to rely upon the diligence of the corporation and to put faith in the recitals in the certificates issued by its agents acting within the general scope of their powers. And the rule is that, if by reason of its negligence in this regard spurious stock, properly authenticated, is issued by dishonest officials, having the power to issue stock, the corporation will be liable to any one purchasing it for value, without knowledge of its fraudulent character. This rests upon the familiar principle that, whenever one of two innocent persons must suffer by the act of a third, he who has enabled such person to occasion the loss must stand it.' 4 Thomp. Corp. § 3566, and authorities there collated."
Randle, 17 Ala. App. at 215, 84 So. at 554-55. Further, in Howe v.Roberts, 209 Ala. 80, 95 So. 344 (1923), this Court stated:
 "[C]omplainant was a bona fide purchaser from a previous holder, the corporation was at fault in issuing [excess shares of stock], and, if the overissued stock in the hands of complainant can be identified, is responsible to complainant in damages. 1 Cook, [Corp.] § 293 [(6th ed.)]. It follows that the corporation should not be heard to have complainant's stock declared void in whole or in part, as its cross-bill prays, without an offer to restore complainant to his status prior to his purchase."
209 Ala. at 81-82, 95 So. at 346.
Article 8 sought to codify the well-established common-law right to recover damages from an issuer who has permitted an overissue to occur and to establish a uniform remedy. See Ala. Code 1975, § 7-8-210, Official Comment, citing New York New Haven R.R. v. Schuyler, supra. Alabama's original Article 8, which was in force at the time Montgomery took *Page 1115 
possession of the stock certificate as collateral, provided:
 "(1) The provisions of this article which validate a security or compel its issue or reissue do not apply to the extent that validation, issue or reissue would result in overissue; but:
 "(a) If an identical security which does not constitute an overissue is reasonably available for purchase, the person entitled to issue or validation may compel the issuer to purchase and deliver such a security to him against surrender of the security, if any, which he holds; or
 "(b) If a security is not so available for purchase, the person entitled to issue or validation may recover from the issuer the price he or the last purchaser for value paid for it with interest from the date of his demand."
Act No. 549, Ala. Acts 1965, p. 956 (current version codified at Ala. Code 1975, § 7-8-210). In his arguments before the trial court, Montgomery sought to establish that he was a "person entitled to issue or validation." Accordingly, if Montgomery is indeed a "person entitled to issue or validation," Article 8 affords him a remedy against the corporation. He could compel the corporation to purchase and deliver to him identical stock that does not constitute an overissue, or, if such stock is not available for purchase, he could recover from the issuer the value he paid for the stock with interest from the date of his demand. While the trial court correctly concluded that the corporation was not liable on the promissory note signed by Frank, that note is evidence of the value paid by Montgomery for the spurious stock.
The trial court also found that the stock in question was issued by Frank to himself "without adequate consideration." Therefore, according to Hughes, that issuance was also void under Article XII, § 234, Ala. Const. 1901, which provides, in part:
 "No corporation shall issue stocks or bonds except for money, labor done, or property actually received; and all fictitious increase of stock or indebtedness shall be void."
We do not believe that the findings of the trial court allow us to reach the same conclusion. We note, however, that while Article 8 of Alabama's Uniform Commercial Code provides no remedy to a holder of a security void by reason of a constitutional provision, neither does it foreclose the previously discussed well-established common-law right to recover damages from a corporation that has permitted the issuance of the spurious stock. See Ala. Code 1975, § 7-1-103 ("Unless displaced by the particular provisions of this title, the principles of law and equity . . . shall supplement its provisions."). Therefore, if Montgomery is a bona fide purchaser, he may be entitled to a remedy against the corporation even if the stock was also void because it violated § 234, Ala. Const. 1901.
Accordingly, we believe that Montgomery's theory of recovery as presented in count I of his complaint and further clarified at trial was a valid theory. Therefore, the trial court's denial of that requested relief based on the fact that the 50 shares of spurious stock secured a personal debt was error.
 III. Conclusion
Insofar as the trial court's judgment held that Montgomery was not entitled to an order compelling Hughes to transfer stock representing 5% of the stock in Hughes to him, it is affirmed. Insofar as the trial court's judgment denied the relief requested in count I of Montgomery's complaint, it is reversed, and the case is remanded for proceedings consistent with this opinion. *Page 1116 
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MOORE, C.J., and SEE, LYONS, BROWN, JOHNSTONE, HARWOOD, WOODALL, and STUART, JJ., concur.
[2] Apparently, upon renewal, the $100,000 loan and the $50,000 loan were evidenced by one promissory note in the amount of $150,000.
[3] Montgomery argues that the trial court erred in finding that the certificate represented an overissue of authorized capital stock. However, because this evidence was in dispute at trial and because it is unclear from the corporate records what amount of stock had already been issued at the time of the purported issuance of the 50 shares in question, we are compelled to accept the trial court's finding that the subject stock was an overissue.