Peter BARTER, Appellant,

v.

Arcangelo DIODOARDO and Wendy Diodoardo, and Southmoore Golf Associates, Inc., Appellees.

Superior Court of Pennsylvania.

Argued Dec. 6, 2000.

Filed April 9, 2001.

Malcolm J. Gross, Allentown, for appellant.

Charles Bruno, Easton, for Southmoore Golf Associates, appellee.

Before JOHNSON, TODD, JJ., and CERCONE, President Judge Emeritus.

TODD, J.:

¶ 1 Peter Barter appeals the judgment entered against him in his lawsuit seeking, among other things, to enjoin or rescind a merger which cashes him out of his interest in Southmoore Golf Associates, Inc. We affirm.

¶ 2 The facts of this case are largely undisputed but involve a complicated corporate history. Southmoore Golf Course, apparently the brainchild of Arcangelo Diodoardo ("Diodoardo"), was owned by Southmoore Limited Partnership. The general partner of Southmoore Limited Partnership was Southmoore Golf Associates, Inc. ("SGAI"), a 98.25% owner of the partnership.

¶ 3 John J. Bartos, Esquire, as its sole incorporator, filed articles of incorporation for SGAI in Pennsylvania on May 3, 1993. The articles authorized 1,000 shares of stock, and indicated no limitations on those shares. On that same day, Bartos signed a unanimous consent, in lieu of an organizational meeting of incorporators, appointing a five person board of directors, including Diodoardo. The board signed a unanimous consent, also dated May 3, 1993, appointing Diodoardo chairman and, despite the limitation in the articles, directing the issuance of 1,150 voting shares and 6,550 nonvoting/restricted shares.[1] All of the 1,150 voting shares were to be issued to Arcangelo Diodoardo and Wendy Diodoardo, and the nonvoting shares apportioned to 15 other people, including 1,500 shares to Barter. However, no shares were issued throughout 1993.

¶ 4 On or about February 15, 1994, Barter agreed to loan $1,000,000 to SGAI at a reduced interest rate of 6%, and issued a

---

**1.** As noted below, Bartos testified that this document had in fact been backdated, having been drafted in February 1994.

check for that amount on February 16, 1994. The loan was secured by a mortgage on the golf course and served as the only consideration for his 1,500 shares of stock.

¶ 5 An amendment to the articles of incorporation, dated February 10, 1994 and signed by Diodoardo, increased the authorized shares of SGAI to 1,150 voting and 7,850 nonvoting shares. The amendment indicated that it was to be effective on the date of its filing with the Pennsylvania Department of State. Bartos testified that he mailed the amendment on February 15, and it was filed on February 23, 1994.

¶ 6 Bartos drafted a shareholders agreement which was dated February 18, 1994 and signed by all the voting and nonvoting shareholders. In this agreement, the shareholders acknowledged their ownership of shares of SGAI as set forth in the May 3, 1993 board of directors consent resolution. Bartos testified that the consent resolution was in fact drafted in February 1994 and backdated. The first stock certificates were issued on February 18, 1994, five days before the articles of amendment authorizing their issuance were filed.

¶ 7 After the articles of amendment were filed, Barter purchased 3,500 additional shares of nonvoting stock—1,200 shares directly from SGAI and 2,300 shares from original shareholders—for a total amount of $525,000. Over the succeeding years, Barter made three additional loans to SGAI and, in all, he loaned $3,500,000 to the corporation.

¶ 8 By 1997, SGAI was having difficulty repaying these loans. During that year, Barter attempted to negotiate concessions from Diodoardo which would have permitted him to have some voting authority and/or control over SGAI, but no agreement was reached. By January 1998, Bar-

ter filed a foreclosure action on the mortgage he had taken in return for his initial loan.

¶ 9 In the spring of 1998, SGAI attempted to secure financing to repay the loans owed Barter; however the bank would not agree to financing without personal guarantees from all the shareholders, a demand which, in effect, would have required Barter to personally guarantee monies to be paid to himself. He refused to give such a guarantee.

¶ 10 Diodoardo testified that in an effort to make SGAI a more attractive candidate for financing he designed a strategy to eliminate Barter's interest in the corporation. On March 1, 1999, Barter was notified that a vote on a merger plan was scheduled for March 12, 1999. Under the plan, SGAI would merge into a preexisting corporation also controlled by Diodoardo, Lehigh Valley PIC ("PIC"). In the process, Barter and five other SGAI shareholders would be cashed-out for $15 a share, with no resulting ownership interest in PIC. Thus, Barter would have received only $75,000 for all of his shares.

¶ 11 On March 9, 1999, Barter notified SGAI that he planned to exercise his dissenting shareholder rights under the Pennsylvania Business Corporation Law. He also indicated that he believed he was entitled to a right of first refusal under the shareholders agreement and was willing to purchase the remaining shares of SGAI for a price "substantially higher" than $15/share. Nevertheless, the merger plan was approved on March 12, 1999 by Arcangelo Diodoardo and Wendy Diodoardo, the only shareholders of SGAI with voting rights. Barter, as an owner of nonvoting stock, was not permitted to vote. The articles of merger were filed with the Commonwealth on April 26, 1999.

¶ 12 On March 15, 1999, Barter brought the present suit seeking to enjoin or rescind the merger of SGAI into PIC, asserting that it was the result of fraud and fundamental unfairness to him. He also sought a declaration that the merger is invalid, arguing that the shares issued to him on February 18, 1994 were technically unauthorized and asserting that as a result of this overissuance of stock, he was entitled to vote on the merger plan. Finally, he asserted that he was entitled to statutory remedies on account of the overissuance. Following a nonjury trial on September 27 and 28, 1999, the trial court, by the Honorable Stephen G. Baratta, denied all of Barter's requests for relief. However, concluding that Barter had timely asserted his dissenting shareholder's rights under 15 Pa.C.S.A. § 1579, the court scheduled a hearing for purposes of establishing the fair market value for his shares of SGAI stock.[2] Barter's post-trial motions were denied and this timely appeal followed.

¶ 13 On appeal, Barter asks the following:

1. Should a corporate merger be restrained or rescinded (as the case may be) on the grounds of fraud or fundamental unfairness where additional benefits outside of the stated terms of the Plan of Merger were granted to other shareholders, but were withheld and concealed from the one dissenting shareholder the merger was designed to involuntarily "cashout"?

2. Can an issuance of stock which was unauthorized by the Articles of·Incorporation at the time of issuance be retroactively "cured" by a later-filed Amendment to the Articles?

3. Can an overissuance of stock be retroactively "cured" by a later-filed Amendment to the Articles of Incorporation?

(Brief for Appellant, at 4.)

¶ 14 As an initial matter, Appellees argue that the trial court and this Court lack subject matter jurisdiction to entertain Barter's claim for injunctive relief. Appellees cite *In re Jones & Laughlin Steel Corp.*, 488 Pa. 524, 412 A.2d 1099 (1980), for the proposition that, once a merger has been consummated, a dissenting shareholder's remedies are limited to an appraisal of the fair value of their stock.

■ ¶ 15 We reject this argument, however, because at the time Barter brought suit seeking injunctive relief the merger was not yet effective. The merger agreement clearly states that the merger would be effective upon the filing of the articles of merger with the secretary of state. (Plan and Agreement of Merger, 3/12/99, Exhibit A to Complaint, at ¶ 9.) *See* 15 Pa.C.S.A. § 1928 (effective date of merger is the date specified in the plan or the date of filing of the articles of merger, whichever is later). Barter filed suit on March 15, 1999, several days after the merger plan was voted on, but well before April 26, 1999, the date on which the articles of merger were filed with the Commonwealth. We therefore conclude that Appellees' argument that this Court and the trial court lacked subject matter jurisdiction is without merit.

■ ¶ 16 We now turn to the merits of Barter's appeal. In his first issue on appeal, Barter argues that the trial court erred in failing to enjoin or rescind the merger on the grounds of fraud or fundamental unfairness. The crux of Barter's claim concerns a "side-deal" involving the other shareholders who were being

2. Due to the· pendency of this appeal, the appraisal hearing has not yet taken place.

cashed-out by the merger whereby they would accept promissory notes in lieu of their $15/share cash-out payment in exchange for continued playing privileges at Southmoore Golf Course. Barter was never offered this deal and asserts that such additional consideration, offered specially to the other shareholders without his knowledge, constitutes fraud and fundamental unfairness.

¶ 17 The record is unclear when this side-deal was first discussed, but Franklin Graver, one of the other cashed-out shareholders, testified that it was discussed at the March 12, 1999 merger meeting at the latest. (N.T., Trial 9/28/99, at 314.) The trial court found as a fact that the side-deal was agreed to only after the merger plan had been adopted. The other cashed-out shareholders sent a letter to PIC dated April 7, 1999 formally making the offer. Apparently this offer was accepted. The trial court found that these golf-playing privileges cost the general public $2,500 a year per individual, and an additional $1,250 for spouses and family members— thus, a substantial value in comparison with the value of the shares of some of the cashed-out shareholders.

¶ 18 The source of Barter's claim of his right to an injunction is 15 Pa.C.S.A. § 1105, which states:

**Restriction on equitable relief**

■ A shareholder of a business corporation shall not have any right to obtain, *in the absence of fraud or fundamental unfairness,* an injunction against any proposed plan or amendment of articles authorized under any provision of this subpart, nor any right to claim the right to valuation and payment of the fair value of his shares because of the plan or amendment, except that he may dissent and claim such payment if and to the extent provided in Subchapter D of Chapter 15 (relating to

dissenters rights) where this subpart expressly provides that dissenting shareholders shall have the rights and remedies provided in that subchapter. *Absent fraud or fundamental unfairness,* the rights and remedies so provided shall be exclusive. Structuring a plan or transaction for the purpose or with the effect of eliminating or avoiding the application of dissenters rights is not fraud or fundamental unfairness within the meaning of this section.

15 Pa.C.S.A. § 1105 (footnote omitted) (emphasis added). Although granted by negative implication, section 1105 thus provides a dissenting shareholder with the right to enjoin a merger in cases of "fraud or fundamental unfairness." *Warehime v. ARWCO Corp.,* 451 Pa.Super. 468, 679 A.2d 1317, 1319–20 (1996). *See also In re Jones & Laughlin Steel Corp.,* 488 Pa. at 532–33, 412 A.2d at 1103–04. Unfortunately, the statute does not define "fraud or fundamental unfairness," nor did our research disclose any caselaw which explains this term. Of course, fraud is a familiar concept, if not in the context of a merger. *See Moser v. DeSetta,* 527 Pa. 157, 163, 589 A.2d 679, 682 (1991) ("It is well established that fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture."); *id.* ("The concealment of a material fact can amount to a culpable misrepresentation no less than does an intentional false statement."). Further, we are not faced with a completely blank slate on the subject of fairness in the treatment of minority and dissenting shareholders.

■ ¶ 19 Our Supreme Court has held that it is a violation of the majority shareholders' fiduciary duty to minority share-

holders to freeze out the *minority for the sole purpose of continuing the business for the benefit of the majority. In re Jones & Laughlin Steel Corp.,* 488 Pa. at 530–31, 412 A.2d at 1102–03. Therefore, some independent rationale for a merger must be provided. *Id.; see also Dower v. Mosser Indus., Inc.,* 648 F.2d 183, 189 (3d Cir. 1981) (recognizing the need to proffer a legitimate business purpose for a merger in order to sustain its legality under Pennsylvania law); 15 Fletcher Cyclopedia of Private Corporations § 7160 (1999) [hereinafter "Fletcher"] (In assessing the fairness of a merger, the "advancement of an independent corporate interest need not be great but must be a benefit for the corporation.").

¶ 20 Further, in the context of a cash-out merger, the Delaware Supreme Court has provided the following characterization of the "fairness" of a merger with respect to dissenting shareholders:

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.

*Weinberger v. UOP, Inc.,* 457 A.2d 701, 711 (Del.1983). In William Meade Fletcher's treatise on corporations, these concepts are further elaborated on:

Fiduciaries seeking to "cash out" minority shareholders of a corporation in a non-arm's-length merger, have a duty to be entirely and scrupulously fair to the minority shareholders in all respects.... The concept of fairness has two basic aspects: fair dealing and fair price.

\* \* \*

Unfair dealing must be something more than an unfairness in the price to be paid the dissenting shareholders for their shares in order for the court to enjoin the merger.... The unfairness must result from nondisclosure or misrepresentation concerning some essential [sic] of the merger itself. The minority shareholders are entitled to disclosure of all material facts in an atmosphere of complete candor.

15 Fletcher § 7160.

¶ 21 The trial court concluded that the side-deal did not constitute fraud or cause the merger to be fundamentally unfair to Barter. In light of the above considerations, we agree.

¶ 22 First, Diodoardo offered an independent business justification for the merger specifically, that the merged corporation would be more attractive to financial institutions so that a loan could be obtained to repay Barter (for the prior loans he made to SGAI). *See Dower v. Mosser Indus., Inc., supra; cf. In re Jones & Laughlin Steel Corp., supra.*

¶ 23 Second, the trial court concluded, which our review of the record gives us no reason to dispute, that the side-deal was made only after the merger plan had been adopted.[3] Thus, it appropriately may be viewed as a deal separate from the merger

---

3. Barter argues that the agreement is nonetheless significant as it occurred before the merger was effectuated by the filing of the ‑‑ticles of merger on April 26, 1999. However-

er, as we note below, Barter does not dispute that the agreement nevertheless was of no interest to him.

and therefore not material to it. Because it was not material to the merger, we cannot conclude that Barter's lack of participation in or knowledge of the deal was fraudulent or fundamentally unfair to him. *See* 15 Fletcher § 7160; *cf. Bershad v. Curtiss–Wright Corp.*, 535 A.2d 840, 846 (Del.1987) ("In evaluating whether [majority shareholders] satisfied their fiduciary duty of candor, the question is one of materiality.").

¶ 24 Finally, as the trial court noted, and which Barter does not dispute, at all times Barter desired to either retain his interest in SGAI, or get a fair price for his shares. As a result, this side-deal simply was of no interest to him. This is another way of saying that, from Barter's perspective, the side-deal was not material to the merger.

■ ¶ 25 It may well be, as the trial court concluded, the terms of the merger are financially unfair to Barter. However, financial unfairness is not the equivalent of fraud or fundamental unfairness, as the Pennsylvania Business Corporation Law, by granting dissenting shareholders the ability to demand an appraisal, *see generally* 13 Pa.C.S.A. §§ 1571–1580, contemplates that a shareholder may be inadequately compensated by the terms of a merger. *See also* 15 Fletcher § 7160.50 ("inadequacy of price, in and of itself, does not constitute fraud or illegality"). The financial fairness of the merger will be addressed in the appraisal hearing which the trial court has scheduled, and its action in so doing has not been challenged and, therefore, is not an issue before us. Under these facts, we cannot conclude that the "side-deal" described above, agreed upon after the merger was voted on, constitutes fraud or fundamental unfairness to Barter. Thus, we affirm the trial court's decision not to enjoin or rescind the merger on this basis.

■ ¶ 26 Barter's second and third issues on appeal concern the technically invalid issuance of stock by SGAI on February 18, 1994. As we noted above, the original articles of incorporation of SGAI authorized only 1,000 unrestricted shares of stock; further, the issuance of 1,150 voting shares and 6,550 nonvoting shares as directed by the board and recognized in the shareholders agreement on February 18 predated the filing on February 23 of the articles of amendment which increased the authorized shares of the corporation. Thus, some of the shares issued on February 18 were unauthorized, overissued, shares. The question is whether the February 23 filing cured this overissuance and, if not, what is the resulting effect on the legality of the merger.

¶ 27 In his second issue on appeal, Barter's argument is, in short, that the February 23 amendment was ineffective to cure the overissuance of stock; that, as a result, on February 18, 1994 only 1,000 shares of voting stock were authorized; that he (and the other shareholders) were therefore issued—overissued—shares of *voting* stock; and that, somehow, this entitled him and the other shareholders to vote on the merger plan. Since he, in particular, was not allowed to vote, he asserts the merger was invalid. While we agree with some of these points, we reach a different conclusion and agree with the trial court that the merger validly was authorized.

■ ¶ 28 By statute, a corporation may create and issue the number of shares stated in its articles. 15 Pa.C.S.A. § 1521. However, a corporation has no right to issue stock, or to increase or reduce its capital stock, without specific legislative authority as embodied in its articles of incorporation. *Cooke v. Marshall*, 191 Pa. 315, 320, 43 A. 314, 315 (1899). Any stock so issued is void. *Id.* at 322, 43 A. at 316; *Krosnar v. Schmidt Krosnar McNaugh-*

ton, 282 Pa.Super. 526, 423 A.2d 370, 374 (1980) ("absent a proper amendment to the articles of incorporation, issuance of shares beyond [the limit specified in the articles] would be void as being beyond the power of the corporation"); *see generally Seven Springs Farm, Inc. v. Croker*, 748 A.2d 740, 749 (Pa.Super.2000) (discussing the importance of adhering to corporate formalities: "It has been said of corporate law that it is not so much *what* is done, but *how* it is done.").

¶ 29 Therefore, the stock issued on February 18, five days before the amendment was filed, was void. The trial court concluded nonetheless that the later-filed amendment cured this overissue. For the reasons below, we cannot agree with this conclusion. However, as we conclude that despite the overissuance of stock the merger was voted upon by all parties entitled to vote, we affirm the court's conclusion that the merger validly was authorized.

¶ 30 Like the trial court, we were unable to find any Pennsylvania caselaw addressing the effect of a later-filed amendment authorizing otherwise overissued shares. For its conclusion, the trial court relied on 13 Pa.C.S.A. § 8210, part of Pennsylvania's enactment of Article 8 of the Uniform Commercial Code for investment securities.[4] In the context of Article 8, this section prescribes the liability of an issuer of securities where other provisions of the Article "which validate a security or compel its issue or reissue" would result in an overissue. 13 Pa.C.S.A. § 8210(b). It defines "overissue" as follows: "In this section, 'overissue' means the issue of securities in excess of the amount the issuer has corporate power to issue, *but an overissue does not occur if appropriate action has cured the overissue.*" *Id.* § 8210(a) (emphasis added). The trial court concluded that SGAI had taken "appropriate action"—by filing the amended articles—to cure the overissue.

¶ 31 Our research has discovered no cases interpreting this section. However, our reading of this section in the context of the other provisions of Article 8 leads us to the conclusion that this section applies only where there is dispute, as between an issuer and a holder of a security, as to its validity. Section 8210 is one of several exceptions to the general rule established in Article 8 that a purchaser of a security for value without notice of a defect can enforce that security *against the issuer.* *See* 13 Pa.C.S.A. § 8202 Official Comment ("Section 8–210[sic], regarding overissue, provides the third exception to the rule that an innocent purchaser for value takes a valid security despite the presence of a defect that would otherwise give rise to

---

4. Section 8210 states in full:

§ 8210. Overissue

(a) **Definition of "overissue".**—In this section, "overissue" means the issue of securities in excess of the amount the issuer has corporate power to issue, but an overissue does not occur if appropriate action has cured the overissue.

(b) **Application of certain provisions limited in cases of overissue.**—Except as otherwise provided in subsections (c) and (d), the provisions of this division which validate a security or compel its issue or reissue do not apply to the extent that validation, issue or reissue would result in overissue.

(c) **Purchase may be compelled.**—If an identical security not constituting an overissue is reasonably available for purchase, a person entitled to issue or validation may compel the issuer to purchase the security and deliver it if certificated or register its transfer if uncertificated, against surrender of any security certificate the person holds.

(d) **Recovery of price paid plus interest.**—If a security is not reasonably available for purchase, a person entitled to issue or validation may recover from the issuer the price the person or the last purchaser for value paid for it with interest from the date of the person's demand.

invalidity."). Here, however, SGAI has not denied the validity of Barter's shares or refused to honor them—quite the opposite—so this provision has no application. At any rate, another provision specifies that Article 8 does not operate to validate a security which contains a "defect [which] involves a violation of a constitutional provision." 13 Pa.C.S.A. § 8202(b)(1); *see generally* 13 Pa.C.S.A. § 8202 Official Comment ("This Article leaves to the law of each particular State the rights of a purchaser on original issue of a security with a constitutional defect."). Such a violation arguably occurs where stock is issued without legislative authority (i.e., without authority in the articles of incorporation). Therefore, we conclude that 13 Pa.C.S.A. § 8210 cannot provide a basis for concluding that the later-filed amendment cured the overissue.

¶ 32 Indeed, although we do not find any Pennsylvania cases addressing this situation, the Delaware Supreme Court has held that a later-filed amendment cannot cure an overissuance. It reasoned:

> We are unable to see how the amendment could have made stock valid that was void because issued without any authority from the State. Such an amendment might cure certain irregularities, imperfections, and defects in a stock issue that is authorized . . . , but it does not seem to us that it can possibly relate back and validate a stock that was issued without any corporate authority. If the stock issue was void, a nullity, there was nothing to validate, nothing upon which the amendment could operate.

*Waggoner v. Laster,* 581 A.2d 1127, 1137 (Del.1990) (quoting *Triplex Shoe Co. v. Rice & Hutchins, Inc.,* 152 A. 342, 347–48 (Del.1930)). We find this analysis to be persuasive and conclude that the stock issued to Barter was void when issued, and that this defect could not have been cured by the later-filed amendment to the articles.[5]

■ ¶ 33 We do not, however, accept Barter's argument that somehow, by concluding that the February 18 issuance to him was void and not cured, he holds valid shares of *voting* stock that entitled him to vote at the merger meeting, and he does not cite any support for this assertion. Rather, we conclude that the Diodoardos were the only shareholders entitled to vote: the original articles of incorporation authorized 1,000 shares of unrestricted stock, and the Diodoardos were the only shareholders who were issued *voting* stock by the board of directors' consent resolution, as recognized in the shareholders' agreement. As they did vote on the merger plan, we conclude that it was properly authorized under the Pennsylvania Business Corporation Law and reject Barter's argument to the contrary.

■ ¶ 34 In his final issue on appeal, Barter asserts that, as he was given overissued stock, he is entitled to the remedies in 13 Pa.C.S.A. § 8210(d), which provides for a monetary recovery where a corporation cannot replace overissued stock with validly issued stock. The trial court found these remedies unavailable as it concluded, as discussed above, that the overissuance was cured. While we have rejected this conclusion, we affirm the trial court on a different basis.

¶ 35 First, as we noted above, we find Section 8210 inapplicable here as SGAI has not challenged the validity of Barter's

---

5. By so concluding, we do not intend to disturb the merger plan and agreement under which Barter is entitled to compensation for his shares. Indeed, our conclusion above that 13 Pa.C.S.A. § 8210 is inapplicable is premised on the assumption that his shares are recognized under the merger plan.

shares; rather, under the merger plan, Barter is to be compensated for his 1,500 shares. We cannot conclude that the legislature intended to provide remedies under this section where the only party challenging the validity of the shares is the shareholder himself and where, in fact, those shares are to be accorded legitimacy by the issuer, albeit, here, by virtue of a merger plan. Second, even were we to find this section applicable, we cannot agree, as Barter argues, that "no stock not constituting an overissue is reasonably available for purchase to replace Barter's overissued stock since the entirety of all of SGAI's stock (exclusive of the authorized 1,000 voting shares) is an overissue" (Brief for Appellant, at 32), a prerequisite to the relief he seeks. *See* 13 Pa.C.S.A. § 8210(d). Rather, to the degree we have concluded that Barter's shares were void as overissued, an identical number of shares *are now* "available for purchase" from SGAI, given that the articles of incorporation subsequently have been amended. Of course, this point is moot, as Barter is to be compensated for his shares in the merger plan. We thus reject his argument and affirm the trial court's denial of remedies to Barter under Section 8210.

¶ 36 For the reasons stated above, we affirm.

¶ 37 Judgment affirmed.