903 So.2d 94 (2004)
HUGHES DEVELOPERS, INC.
v.
Mays E. MONTGOMERY.
1030841.
Supreme Court of Alabama.
October 1, 2004.
Rehearing Denied December 17, 2004.
*95 Robert V. Rodgers of Wilmer & Lee, P.A., Huntsville, for appellant.
*96 J. Robert Miller, Huntsville, for appellee.
LYONS, Justice.
The defendant, Hughes Developers, Inc., appeals from a judgment of the Madison Circuit Court awarding the plaintiff, Mays E. Montgomery, $178,875. The judgment represents the total amount of a loan, plus interest, made by Montgomery to Morris W. Frank, the former president of Hughes Developers. We reverse and remand.

I. Facts and Procedural History
This is the second time this case has come before this Court. In the first opinion, Montgomery v. Hughes Developers, Inc., 873 So.2d 1109 (Ala.2003) ("Montgomery I"), we reversed the trial court's judgment insofar as it held that, because the stock he held as collateral was void, Montgomery was not entitled to any remedy against Hughes. In Montgomery I, we set forth the facts as follows:
"On May 20, 1991, Mays E. Montgomery lent Morris W. Frank $100,000; to secure that loan Frank executed a promissory note, which contained a notation stating that `(5%) 50 shares of Hughes Developers, Inc. to be assigned as additional collateral.' In accordance with this notation, Montgomery received as collateral from Frank `Stock Certificate No. 8' of Hughes representing 50 shares of stock (`the certificate'), together with an `Irrevocable Stock or Bond Power' signed by Frank. The certificate had been issued to Morris Frank on May 1, 1991. The certificate bore the corporate seal and was signed twice by Morris Frank in his corporate capacities as president and secretary of Hughes. In 1994, Montgomery lent Frank an additional $50,000, which was secured by the same 50 shares of stock. Frank paid interest on the note and executed a renewal note each year until 1997.
"Hughes was incorporated in Madison County, Alabama, in 1989. The articles of incorporation list Frank as one of two original incorporators and as one of the initial directors of the corporation. The articles limited the number of authorized shares to 1,000.
"It is undisputed that, at the time of the original loan, Frank served as president, secretary, and operating officer of Hughes. All stock certificates issued by Hughes that could be located had been signed by Frank, as issuing agent, on behalf of the corporation, including stock Hughes had issued to him. No other authorized issuing agent was identified by Hughes at trial; indeed, no other signature, besides Frank's, appears on any of the admittedly valid stock certificates issued by Hughes. While there were at least three other shareholders in Hughes, the operation of Hughes, with few exceptions, appears to have been controlled solely by Frank.
"In 1997, Frank ceased making any payments on the note. After Frank's death in 1998, Montgomery requested that Hughes transfer into his name the certificate Montgomery had received as collateral for his loan to Frank. Gregory D. Gray, a shareholder of Hughes, who became president and a director of the corporation following Frank's death, denied Montgomery's request to transfer the certificate representing 50 shares of stock to Montgomery because the 50 shares of stock represented by the certificate were in excess of the total number of shares authorized by the articles of incorporation and the certificate representing the 50 shares was therefore void.
"Montgomery sued Hughes and Gray, seeking the following relief:

*97 "`COUNT I

"`....
"`9. That [Montgomery] be granted a Judgment against Hughes for the sum of $150,000.00, interest and attorney fees, which will extinguish the debt owed Montgomery, and upon payment of the same that Montgomery be ordered to deliver unto Hughes the stock assigned by Frank to Montgomery.
"`COUNT II

"`....
"`10. [Montgomery] moves that the Court order and direct the stock certificate of Hughes which is in the possession of Montgomery, being 50 shares of Hughes, be transferred and reissued by Hughes to Montgomery, and the stock of Hughes be structured to allow Montgomery to own 5% of the total number of shares of common stock of Hughes Developers, Inc. which will have the effect of having Montgomery being the owner of 5% of Hughes Developers, Inc.
"`COUNT III

"`....
"`11. That in the event [Montgomery] is mistaken for the relief moved for, [Montgomery] moves for such further and different relief as may be meet and proper.'
"Before trial, Gray was dismissed from the action. Montgomery has not appealed that dismissal.
"At trial, Hughes alleged that the 50 shares of stock held by Montgomery were spurious; that those shares exceeded the authorized capital stock of the corporation; that the excess stock was unauthorized by the corporation; and that the corporation had received no consideration for the pledge of stock to Frank.
"Also at trial, Montgomery's counsel attempted to clarify his claim for relief against Hughes as stated in count I of his complaint, stating that the claim was based on the certificate, and not on the personal note signed by Frank:
"`THE COURT: You have got another action in which you're essentially attempting to have the corporation made responsible for the loan and I noted that the notesnone of the notes were signed in the capacity as president of the corporation and, I guess, I am sitting here while you go through all wondering if you are trying to perform the note or establish some kind of apparent authority to execute a note on behalf of the corporation, to make the corporation
"`[Montgomery's counsel]: No, sir, not in any way whatsoever. What I am trying to show is thatis that there has been a defense asserted that this stock is not valid, that it is not proper stock, that, number one, that it is fraudulenthis answer says it is a fraud, his answer states all of these things. We contend that we will show by the evidence and by the actions of Morris Frank that he had total, complete, unqualified control of this corporation and could do anything he wanted to and I contend that that is the evidence and that is what the totality of all of this is.
"`THE COURT: So you are not maintaining your claim then that the corporation is responsible for the 100
"`[Montgomery's counsel]: No, sir, there are some cases, though, that seem to indicate that if a person who has been given apparent authority goes out and he does issue some type *98 of fraudulent stock, let us say that, but yet the corporation clothed him with the authority to do things of that nature, then the corporation might be liable for a judgment, but as far as executing a note and saying the corporation is responsible, no, I am not doing that.
"`THE COURT: So then if I understand you then, you are not still maintaining a claim against the corporation for $150,000 plus interest judgement on the grounds that when Mr. Frank signed, he signed on behalf of the corporation?
"`[Montgomery's counsel]: I am not saying he signed on behalf of the corporation, but if the corporation gave him the authority to go out and issue stock and sell land and do anything he wanted to as ajust a personal corporation, and he goes out and he issues stock, then, in my opinion, they would be barred from that and even though they might not honor the stock, there are some cases which hold they are required to pay off.'
"Following the hearing, Montgomery also presented written arguments to the trial court in which he argued that even if the trial court found that the 50 shares represented an overissue of Hughes's stock, the overissue provision of Article 8 of Alabama's Uniform Commercial Code justified the recovery requested in count I of his complaint.
"After an ore tenus hearing the trial court found as follows: `The stock Certificate Number 8 purportedly issued by the defendant corporation to Morris W. Frank, in which the plaintiff claims a security interest, was an overissue of stock unauthorized by the corporation.' The trial court concluded:
"`Therefore, the Certificate Number 8, and the shares it purports to represent, are void. As the plaintiff cannot hold a valid security interest in a void instrument, plaintiff's claim for relief in Count II for an order directing the defendant corporation to issue him a stock certificate declaring his ownership of 50 shares of stock in, or 5% ownership of, the defendant corporation is denied.'
"The trial court also found:
"`The debt owed the plaintiff was incurred by Morris W. Frank personally. It was not the debt of, and was not guaranteed by, the defendant corporation. Therefore, plaintiff's claim for relief in Count I is denied.'
"The trial court further summarily denied `all other claims.' Montgomery appealed."
873 So.2d at 1110-12 (footnote omitted).
In July 2003, Hughes offered to purchase 50 shares of outstanding stock from its bona fide shareholders and tender those shares to Montgomery in satisfaction of his claim. Montgomery refused, preferring money damages. On remand, Hughes moved for an evidentiary hearing. The trial court denied the motion and entered a judgment against Hughes in the amount of $178,875, representing the amount of the loan plus interest. Hughes filed a postjudgment motion; in that motion, Hughes argued that Montgomery's sole remedy was to accept the shares of stock Hughes had offered to him. The trial court denied the motion, and Hughes appealed.

II. Standard of Review
The trial court's findings of fact are presumed correct and its judgment based on those findings will not be disturbed absent plain error. Questions of law and the application of the law are to be reviewed de novo. Allstate Ins. Co. v. Skelton, 675 So.2d 377, 379 (Ala.1996).

*99 III. Applicability of Article 8 of Alabama's Commercial Code

A. Availability of Validation Pursuant to § 7-8-202
Section 7-8-202, Ala.Code 1975, validates an otherwise invalid security in certain situations. See § 7-8-202(b)(1), Ala.Code 1975 (validating an invalid security in the hands of a purchaser for value without notice).[1] Whether the provisions of § 7-8-202 are applicable in the instant case depends upon the definition in Alabama's version of the Uniform Commercial Code ("the UCC") of "security" and "purchaser for value."
"Security," for purposes of Article 8, is defined in § 7-8-102(a)(15) as
"an obligation of an issuer or a share, participation, or other interest in an issuer or in property or an enterprise of an issuer:
"(i) which is represented by a security certificate in bearer or registered form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer;
"(ii) which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests, or obligations; and
"(iii) which:
"(A) is, or is of a type, dealt in or traded on securities exchanges or securities markets; or
"(B) is a medium for investment and by its terms expressly provides that it is a security governed by this article."
(Emphasis added.)
Shares of stock of a closely held corporation are "securities" for purposes of Article 8. While such stock may not actually be "dealt in or traded on [a] securities exchange[] or securities market[]," the phrase "of a type" includes closely held stock in the definition of "securities." See In re Sandefer, 47 B.R. 133, 137 (Bankr.N.D.Ala.1985) (interpreting § 7-8-102); Thompson v. Kohl, 216 Ga.App. 148, 453 S.E.2d 485, 487 (1994) (applying Georgia's version of § 7-8-102, which is similar to Alabama's); Baker v. Gotz, 387 F.Supp. 1381, 1389-90 (D.Del.1975) (applying a provision of the Delaware Code similar to § 7-8-102).
Further, § 7-8-103(a), Ala.Code 1975, which, according to its Official Comment, "contains rules that supplement the definition[] of . . . `security' in Section 8-102," provides that "[a] share or similar equity interest issued by a corporation, business trust, joint stock company, or similar entity is a security." The Official Comment to § 7-8-103 states, in relevant part, that "shares of closely held corporations are Article 8 securities." Therefore, under either § 7-8-102 or § 7-8-103, the stock of a closely held corporation satisfies the definition of "security" for purposes of Article 8.
"Purchaser" means "a person who takes by purchase." § 7-1-201(33). "Purchase" includes "taking by sale, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction creating an interest in property." § 7-1-201(32), Ala. *100 Code 1975. This definition easily embraces taking an interest in the stock of a corporation as collateral for a loan.
A person gives "value" for rights if he or she acquires those rights in return for the extension of credit, as security for a preexisting claim, or for any consideration sufficient to support a contract. § 7-1-201(44), Ala.Code 1975. Under the foregoing definitions in § 7-1-201, Montgomery is considered a purchaser for value under Alabama's version of the UCC. Hughes does not argue that Title 7, Article 8, is inapplicable because Montgomery had notice of any defect in the issuance of the stock. As a purchaser for value without notice, he is entitled to the protection afforded by § 7-8-202 from defenses asserting invalidity.

B. Effect of § 7-8-210
An overissue of stock occurs when the securities issued exceed the amount the corporation has the power to issue. § 7-8-210(a), Ala.Code 1975. When the corporation's articles do not authorize the further issuance of stock, as in the current situation, any stock issued in excess of the amount authorized is void. See Crawford v. Twin City Oil Co., 216 Ala. 216, 218, 113 So. 61, 63 (1927) ("It is a well-established principle that any issue of stock by a corporation in excess of the amount prescribed or limited by its charter is ultra vires, and the stock so issued is void, even in the hands of a bona fide purchaser for value.").
Section 7-8-210(b) limits the relief available under other provisions of Title 7, Article 8, such as § 7-8-202, when validation of a security would result in an overissue of stock. Subsections (c) and (d) of § 7-8-210 provide a remedy in such a circumstance. Subsection (c) states:
"If an identical security not constituting an overissue is reasonably available for purchase, a person entitled to issue or validation may compel the issuer to purchase the security and deliver it...."
Subsection (d) states:
"If a security is not reasonably available for purchase, a person entitled to issue or validation may recover from the issuer the price the person or the last purchaser for value paid for it with interest from the date of the person's demand."
In this case, an identical security was "reasonably available for purchase" because Hughes was able to purchase outstanding stock, which it offered to do and to make available to Montgomery in satisfaction of his claim. As previously noted, Montgomery rejected Hughes's offer.
Does the availability of identical stock preclude Montgomery from the remedy of money damages under § 7-8-210(d)? In other words, can a person entitled to validation refuse to accept replacement stock and instead seek to recover the "price the person or the last purchaser for value paid for [the invalid security] ... ?" We think not.[2]
While our research has not revealed significant analysis of this issue, we think a fair reading of § 7-8-210(d) requires the absence of identical stock before money damages may be recovered. The first clause of subsection (d), setting forth a remedy in money damages, reads, "[i]f a security is not reasonably available for purchase...." (emphasis added), thereby creating a condition precedent to the availability of the remedy provided by the remainder *101 of the subsection. See Barter v. Diodoardo, 771 A.2d 835, 844 (Pa.Super.Ct.2001) (construing similar language in Pennsylvania's version of § 7-8-210 and describing the lack of "reasonably available" stock as a prerequisite to recovery of monetary relief). See also Farmers State Bank & Trust Co. v. City of Yates Ctr., 229 Kan. 330, 337, 624 P.2d 971, 978 (1981) ("The City contends that the invalidity of the notes relieves it of contractual liability. However, K.S.A. 84-8-104 spells out the remedies of the holders of the overissue notes. There are two possible remediesthe City may issue an identical note which does not constitute an overissue, or the holder may recover from the City the purchase price of the notes plus interest from date of demand. Since the first alternative was not availablethe City had no identical securities not constituting overissuesthe trial court awarded judgment on the basis of the second alternative, purchase price plus interest on demand. This, we hold, was proper under the statute; although the notes constituted an overissue and were thus not valid securities, the purchasers were not left without a remedy.") (emphasis added).
Section 7-8-404, Ala.Code 1975, which sets forth remedies for the wrongful registration of transfer of a security to a person not entitled to such security, while not directly applicable here, does provide further support for the foregoing reading of § 7-8-210. Section 7-8-404(b) states that an issuer must provide the injured party with a substitute security unless an overissue would result, in which case the remedy is to be determined by § 7-8-210. The Official Comment to § 7-8-404 acknowledges the existence of pre-Code cases that "allowed the registered owner to elect between an equitable action to compel issue of a new security and an action for damages." But the Comment goes on to state that "Article 8 does not allow such election. The true owner of a certificated security is required to take a new security except where an overissue would result and a similar security is not reasonably available for purchase." (Emphasis added.) This Comment indicates that the absence of a similar security is a prerequisite to the collection of money damages when the overissue provisions of § 7-8-210 are applied.[3]
We believe this to be the most reasonable reading of the statute in that it leaves the creditor with exactly what he bargained for: stock as collateral for a loan. Montgomery took shares of Hughes Development, Inc., to secure a loan. Had the shares been valid, upon default by Frank, Montgomery would have been entitled to ownership of the stock and nothing more. Our reading of § 7-8-210 achieves the same result and puts Montgomery in the same position as if the shares had been valid.
*102 Montgomery argues that § 7-8-210 is not the sole remedy available to him and that he has a common-law right to recover money damages. We disagree. The purposes of the UCC include the simplification, clarification, and modernization of the law governing commercial transactions. § 7-1-102, Ala.Code 1975. While it is true that, under § 7-1-103, application of the UCC is to be supplemented with the principles of law and equity, we conclude that the drafters of § 7-8-210 intended it to be the sole remedy in the case of an overissue. The latest Official Comments to § 7-1-103, Ala.Code 1975, state:
"[The UCC] is the primary source of commercial law rules in areas that it governs, and its rules represent choices made by its drafters and the enacting legislatures about the appropriate policies to be furthered in the transactions it covers. Therefore, while principles of common law and equity may supplement provisions of the [UCC], they may not be used to supplant its provisions, or the purposes and policies those provisions reflect.... [The UCC] preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies."
A surviving common-law right to sue for damages in the instant case, distinct from the remedy offered under § 7-8-210 when applicable, would conflict with the policies of simplification and clarification as embodied by the UCC. See also American Liberty Ins. Co. v. AmSouth Bank, 825 So.2d 786, 795 (Ala.2002) ("Under 7-1-103, when a statute provides a cause of action relating to a specific factual situation in a specific manner, then any common-law cause of action based upon a factual situation so materially identical that it is clearly within the specific scope of the provision must be said to have been `displaced'...."). In Montgomery I, the existence of common-law remedies was recognized in dicta dealing with the circumstance that might be presented if the original stock issue violated a constitutional provision. Because in Montgomery I this Court concluded that there was no constitutional defect and because we have not been asked to revisit that determination, we pretermit further discussion of the availability of common-law remedies under such circumstance.

IV. Conclusion
Montgomery is a "purchaser for value" under § 7-8-202, Ala.Code 1975. Because Hughes does not contend that Montgomery had notice of the invalidity of the stock, Montgomery is entitled to relief under § 7-8-210. The sole remedy for an aggrieved purchaser for value of a security resulting in an overissue is set forth in § 7-8-210. Because a security not constituting an overissue is reasonably available for purchase, Montgomery is entitled under § 7-8-210(c) to 50 shares of stock in Hughes. Because the absence of a reasonably available identical security is a prerequisite to money damages under § 7-8-210(d), Montgomery is not entitled to money damages. We reverse the trial court's judgment and remand this case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
NABERS, C.J., and JOHNSTONE and WOODALL, JJ., concur.
HOUSTON, J., concurs specially.
HOUSTON, Justice (concurring specially).
As the author of the opinion in Montgomery I, I apologize for the confusion that opinion caused the trial court and the parties.
This Court held that the trial court could not find that the issuance of the 50 shares of stock in Hughes pledged to *103 Montgomery was constitutionally void and that, therefore, Montgomery could proceed under Ala.Code 1975, § 7-8-210(c) or (d). The confusion is caused by the dicta concerning what Montgomery could do in the event he could not proceed under § 7-8-210 because the issuance of the stock was void by reason of a constitutional provision. To compound dicta, I believe that if he could have proceeded under § 7-1-103 Montgomery would have been limited in damages to the value that the last purchaser for value paid for each share of Hughes's stock, times the number of shares Montgomery had (50). If Hughes could not have complied with § 7-8-210(c), Montgomery's damages would have been the same under § 7-8-210(d), or under "the principles of law and equity," Ala.Code 1975, § 7-1-103.
NOTES
[1] While § 7-8-202 excepts from validation a security with a defect involving a violation of a constitutional provision, we do not deal with that circumstance in this proceeding. In Montgomery I this Court found no constitutional defect; we have not been asked on this appeal to revisit that finding.
[2] Because of our holding, we make no determination as to the propriety of a monetary award commensurate with the amount of the note, plus interest, under the circumstances of this case.
[3] Montgomery does not contend that he has been damaged by a decline in the value of the securities because Hughes failed seasonably to offer valid securities. See Tuggle v. American Fin. Sys., Inc. (Del. Ch., Civ. A. No. 450, June 22, 1978) (unpublished opinion) ("If defendant had promptly tendered to plaintiff like securities, after the plaintiff's demands on October 24, 1973 and December 19, 1973, defendant would be relieved of paying the value of the stock as of the demand date. But defendant elected not to do this. It would violate all the concepts that this Court in doing equity should make an aggrieved party whole, for me to require plaintiff, after demanding the return of her securities in 1973 and then unjustly being denied her securities for almost five years, to accept a like security of greatly diminished value."). See Stone v. Mellon Mortgage Co., 771 So.2d 451, 456 n. 1 (Ala.2000) ("[A case's] unpublished status ... does not preclude us from using it in our analysis. No opinion from another state court is binding on the courts of Alabama, but we often cite such an opinion as persuasive authority.").